980 A.2d 510

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Craig WILLIAMS, Appellant.**

Supreme Court of Pennsylvania.

Submitted June 3, 2008.

Decided Oct. 2, 2009.

362

364

Teri B. Himebaugh, Esq., Barbara Ann McDermott, Esq., Schwenksville, for Craig Williams.

Hugh J. Burns, Esq., Amy Zapp, Esq., Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD, McCAFFERY and GREENSPAN, JJ.

## OPINION

Justice BAER.

On October 19, 2001, our Court remanded this post-conviction capital case to the Philadelphia County Common Pleas Court ("PCRA court") because it had improperly adopted the reasoning set forth in the Commonwealth's motion to dismiss, and failed to issue a substantive opinion addressing the merits of the petition filed by Appellant, Craig Williams. *Commonwealth v. Williams*, 566 Pa. 553, 782 A.2d 517 (2001) (*Williams I*). Following remand, the Commonwealth consented to the grant of a new capital penalty hearing. Accordingly, on July 11, 2006, without conducting an evidentiary hearing, the PCRA court entered an order, which granted Appellant a new penalty hearing, and dismissed his guilt-phase claims.[1] The PCRA court thereafter issued an opinion regarding Appellant's guilt-phase claims pursuant to our directive. Appellant has appealed that portion of the PCRA's order, which denied him a new trial. For the reasons set forth herein, we affirm.

The circumstances underlying Appellant's convictions of first degree murder and related offenses were set forth in detail in our opinion in *Williams I,* as well as in our opinion affirming Appellant's judgment of sentence of death on direct appeal. *Commonwealth v. Williams,* 532 Pa. 265, 615 A.2d 716 (1992). For purposes of clarity, we shall restate those facts relevant to the issues presented.

1. The order did not specify the grounds upon which the new penalty hearing was granted. As the Commonwealth has not appealed the grant of a new penalty hearing, any penalty-phase claims previously raised by Appellant are irrelevant to this appeal.

In the spring of 1987, Appellant was intimately involved with two women, Erica Riggins and Jean Hargrove. Hargrove was six months pregnant with Appellant's child at the time. On April 1, 1987, Riggins physically attacked Hargrove, causing serious injury, and threatened future harm. Two days later, Appellant learned that Riggins was in Hargrove's Philadelphia neighborhood, and ran there, purportedly to protect Hargrove. When Appellant was running down North Lambert Street, he spotted Riggins sitting in a parked blue Cadillac in the middle of the street. As Appellant continued running toward the Cadillac, he began shooting his .38 caliber revolver at Riggins. Just as Appellant fired, 57 year-old Gordon Russell, who was walking down the street carrying groceries, passed between Appellant and Riggins, and suffered a fatal gunshot wound to the back. Immediately thereafter, Riggins fled the scene in her vehicle and Appellant fled on foot. Appellant was not apprehended until nearly two weeks later, and was charged with first degree murder and related offenses.

During *voir dire*, defense counsel objected to the prosecutor's purported discriminatory use of peremptory challenges to exclude African Americans from the jury, and the trial court directed the prosecutor to articulate her reasons for the strikes. The trial court credited the prosecutor's race-neutral explanations and concluded that Appellant failed to establish purposeful discrimination.[2]

At trial, the Commonwealth presented testimony from two eyewitnesses, Kevin Harrell and Catherine Rivers. Harrell testified that he observed Appellant holding a gun as he moved toward Russell, Riggins, and the blue Cadillac on North Lambert Street. He explained that he heard gunshots and then saw Russell fall to the ground. Harrell did not see any gunshots being fired from the Cadillac. Rivers testified that she was looking out the window of her residence when she saw a young boy shooting at a blue car. She corroborated Harrell's testimony that no shots were fired from the vehicle.

2. The issue of racial discrimination in jury selection was not pursued by Appellant on direct appeal.

While Rivers did not see the face of the shooter, the physical description she gave to police matched Appellant. The testimony of Harrell and Rivers was consistent with that given by police officers, detectives, and medical examiners, which established that Russell was shot in the back.

Appellant did not testify at trial, but presented four witnesses who testified that they observed Riggins, and not Appellant, fire the shots that killed Russell.[3] While all the defense witnesses indicated that Appellant was not carrying a gun, they gave varying accounts of the incident, some of which were inconsistent with the physical evidence.

The jury resolved the credibility determinations in favor of the Commonwealth, and, on June 16, 1988, convicted Appellant of first degree murder, recklessly endangering another person, and possessing an instrument of crime. At the conclusion of the penalty hearing, the jury found one aggravating circumstance, that Appellant knowingly created a grave risk of death to another person in addition to the victim of the offense, 42 Pa.C.S. § 9711(d)(7), and no mitigating circumstances. Accordingly, on January 29, 1990, Appellant was sentenced to death. The trial court denied post-trial motions, and new counsel was appointed for purposes of perfecting an appeal.

While the direct appeal was pending, on April 23, 1991, trial counsel committed suicide. Thereafter, on October 9, 1992, this Court affirmed Appellant's conviction and sentence. *Williams*, 532 Pa. 265, 615 A.2d 716 (1992). On May 20, 1996, Appellant filed a *pro se* petition pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541 *et seq.*[4] PCRA counsel was ultimately appointed, and an amended PCRA petition was filed on August 14, 1997.

Therein, Appellant asserted that the Commonwealth violated former Pa.R.C.P. 352 by failing to provide written notice of

3. The defense witnesses did not come forward with information until the week of trial.

4. Appellant's petition is deemed timely filed as it was his first PCRA petition and was filed within one year of the effective date of the 1995 amendments to the PCRA. *See* Section 3(1) of the Act of Nov. 17, 1995 (Spec.Sess. No. 1) P.L. 1118, No. 32; *Commonwealth v. Peterkin,* 554 Pa. 547, 722 A.2d 638 (1998).

the existence of aggravating circumstances. He further argued that trial counsel was burdened by a conflict of interest due to his acceptance of legal fees from enumerated third parties, which led him to present an "all-or-nothing" defense, instead of seeking a "compromise verdict" based on the theory that Appellant fired the shots only to scare Riggins. Appellant's Amended PCRA Petition at Paragraph 52. He further contended, *inter alia*, that trial counsel was ineffective for: failing to ask venirepersons whether they believed a first degree murder verdict automatically required a sentence of death; failing to interview witnesses prior to trial; failing to use Appellant's available mental history to prove diminished capacity; failing to prepare for the penalty phase; and failing to present sufficient mitigation evidence. Appellant additionally contended that appellate counsel was ineffective for failing to preserve the claim relating to racial discrimination in jury selection in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Finally, Appellant requested an evidentiary hearing and sought leave of court to file supplemental pleadings, affidavits, and memoranda in support of his petition.

The Commonwealth subsequently filed a motion to dismiss, in which it sought dismissal of the PCRA petition based on 42 Pa.C.S. § 9543(b), which provides for the dismissal of a PCRA petition if a delay in filing prejudiced the Commonwealth's ability to respond to the PCRA petition or retry the petitioner. It submitted that such dismissal was appropriate here because Appellant did not raise his ineffective assistance of counsel claims until five years after trial counsel's death. The Commonwealth further contended that Appellant's claims failed on the merits.

On November 13, 1997, the PCRA court conducted a brief proceeding, spanning only ten pages of testimony. In addition to PCRA counsel, an attorney for the former Center for Legal Education, Advocacy, and Defense Assistance ("CLEADA") appeared to advocate for Appellant. No substantive arguments were advanced by the parties regarding the PCRA petition or the Commonwealth's motion to dismiss. Instead,

the PCRA court merely declined to recognize CLEADA's representation, and announced its intention to dismiss the PCRA petition. The PCRA court subsequently issued written notice of its intent to dismiss the petition pursuant to former Pa.R.Crim.P. 1509(C)(1), on the grounds that the claims raised therein were meritless.

Appellant thereafter filed a series of affidavits and documents supporting his PCRA claims. After reviewing such filings, but without conducting any further on-the-record proceeding, the PCRA court issued an order on December 4, 1997, denying the amended PCRA petition. PCRA counsel filed a notice of appeal, and was thereafter granted leave to withdraw. Counsel for CLEADA pursued Appellant's PCRA appeal.

As mentioned in the outset of this opinion, the PCRA court adopted the reasoning set forth in the Commonwealth's motion to dismiss in its written opinion supporting the denial of the PCRA petition. Appellant subsequently filed a motion in our Court seeking, *inter alia*, a remand. While the Commonwealth initially opposed such relief, it ultimately assented, based on our then-recent decision in *Commonwealth v. Roy Williams*, 557 Pa. 207, 732 A.2d 1167 (1999), in which we held that the PCRA court erred by adopting the Commonwealth's motion to dismiss, without affording an autonomous judicial expression of the reasons for dismissal of the PCRA petition.

As both Appellant and the Commonwealth agreed that a remand was appropriate pursuant to *Roy Williams,* we held that the appropriate course was to remand to the PCRA court for the preparation of an adequate opinion. *Williams I,* 782 A.2d at 522. We indicated that the "PCRA court will be authorized to conduct such hearings as may be necessary or appropriate to the completion of this task, guided by the framework established in [*Roy Williams*]." *Id.* at 523. Acknowledging that Appellant's petition could be vulnerable to dismissal for failure to allege properly appellate counsel ineffectiveness, this Court emphasized that the PCRA court did not indicate in its dismissal notice that Appellant's amended petition was deficient in this regard. Thus, we concluded that

dismissal of Appellant's petition could not be affirmed on such basis. *Id.* at 527.[5]

During the years following the remand, the PCRA court conducted numerous status listings and hearings, during which it addressed various discovery requests and motions. While the parties and the PCRA court discussed the prospect of conducting an evidentiary hearing regarding the factual averments contained in the PCRA petition and the parameters of the evidence to be presented, no hearing was ever conducted.[6] On November 8, 2004, pursuant to Pa.R.Crim.P. 907, the PCRA court issued a notice to dismiss Appellant's amended PCRA petition without a hearing on the grounds that the claims raised therein were meritless. Appellant thereafter again amended his PCRA petition on January 26, 2005, by, *inter alia,* raising new challenges to trial counsel's ineffectiveness for failing to object to various jury charges, and for failing to pursue alternative defenses, such as diminished capacity. Appellant further added claims of ineffective assistance of appellate counsel to avoid potential waiver of previously asserted claims of trial counsel ineffectiveness. He also presented additional witness affidavits, including one from Appellant's direct appeal counsel, which indicated that counsel believed he could raise only record-based claims on direct appeal. Appellate counsel further explained that he had no strategic reason for failing to preserve the claims pursued in the PCRA petition.

As referenced *supra,* on June 8 2006, the Commonwealth conceded that a new penalty hearing was warranted,[7] but contended that an evidentiary hearing was no longer neces-

5. Four Justices filed concurring opinions. While all members of the Court agreed that a remand was warranted pursuant to *Roy Williams,* the concurring opinions set forth differing views regarding the proper manner of presenting layered claims of ineffective assistance of counsel.

6. At a status conference held on May 30, 2002, the PCRA court indicated that it would permit an evidentiary hearing on various issues. Subsequently, at a status conference on February 24, 2005, the PCRA court again discussed the parameters of evidence to be presented at an evidentiary hearing.

7. The document filed by the Commonwealth did not reveal the basis for its belief that a new penalty hearing should be granted.

sary because Appellant's guilt-phase claims were meritless and could be resolved on the pleadings. The PCRA court agreed, and, on July 11, 2006, entered an order granting Appellant a new penalty hearing and denying the guilt-phase claims contained in Appellant's PCRA petition. The PCRA court issued its opinion in support of its decision on November 29, 2006.

Therein, the court initially noted that Appellant's guilt-phase claims were subject to dismissal pursuant to Section 9543(b) of the PCRA, which allows for dismissal due to prejudicial delay in filing. The PCRA court found that, while Appellant's petition was filed within the statutory time limit, *see* n. 4, *supra,* he delayed filing his petition for more than five years after trial counsel's death, rendering the Commonwealth unable to rebut the allegations of conflict of interest and trial counsel ineffectiveness. The court held that such allegations were clearly known to Appellant prior to trial counsel's death.

Nevertheless, the PCRA court examined the substance of the claims raised and found them to be without merit. The court held that Appellant's trial counsel presented a competent defense based on eyewitness testimony, and that Appellant's bald claim of a conflict of interest was unsubstantiated. It noted that the fact that Appellant's intended victim, Riggins, paid a portion of Appellant's legal fees did not cause trial counsel to decline to call her as a witness. According to the trial court, trial counsel did not call Riggins to testify because her purported testimony, which indicated that Appellant fired the fatal shots by accident, was inconsistent with Appellant's defense that Riggins was the shooter. The court further rejected Appellant's contention that trial counsel was motivated only by the payment of fees. It relied on trial counsel's October 4, 1989 letter to the court, which stated that he filed post-trial motions "as a matter of courtesy" because Appellant's family lacked funds, and requested that the Commonwealth be charged with the costs of transcribing the notes of testimony.[8]

8. The October 4, 1989 correspondence was attached as Exhibit A to the Commonwealth's motion to dismiss Appellant's amended PCRA petition.

The PCRA court also found unjustifiable Appellant's claims that trial counsel was ineffective for failing to pursue the defenses of "diminished capacity" and/or "passion and provocation." It ruled that to proceed on those defenses, Appellant would have had to admit to shooting the victim, and attempt to prove that he was incapable of forming the specific intent to kill. The PCRA court reiterated that such defenses were inconsistent with the defense theory that Riggins was the perpetrator. Moreover, the court emphasized that because Appellant had two days to "cool off" after Riggins attacked Hargrove, there was little force to the defense of "passion and provocation."

Additionally, the PCRA court rejected Appellant's claim that appellate counsel was ineffective for failing to pursue a *Batson* claim on direct appeal. The court noted that Appellant failed to provide the requisite record pursuant to *Commonwealth v. Spence*, 534 Pa. 233, 627 A.2d 1176 (1993), setting forth the identity of the race of the venirepersons who had been removed by the prosecution, the race of the jurors who served, and the race of the venirepersons who were acceptable to the Commonwealth, but who were stricken by the defense. The court also noted that the *Batson* claim failed on the merits because the trial court credited the prosecutor's race-neutral reasons for the strikes when trial counsel objected at trial.

The PCRA court also ruled that trial counsel was not ineffective for failing to object to the trial court's jury charge regarding the Commonwealth's burden of proving malice, as such charge was proper. Likewise, the court found that trial counsel was not ineffective for failing to request an instruction on imperfect self-defense or involuntary manslaughter because such charges were not supported by the evidence.

■ Current counsel subsequently entered their appearance, and filed the instant appeal to this Court. On appeal from the denial of PCRA relief, our standard of review calls for us to determine whether the findings of the PCRA court are supported by the record and are free from legal error.

374

*Commonwealth v. Washington,* 592 Pa. 698, 927 A.2d 586, 593 (2007).

Initially, we note that, to be eligible for PCRA relief, Appellant must prove by a preponderance of the evidence that his conviction or sentence resulted from one or more of the enumerated circumstances found at 42 Pa.C.S. § 9543(a)(2). Further, Appellant must demonstrate that the issues raised in his PCRA petition have not been previously litigated or waived. *Id.* at § 9543(a)(3). An issue has been previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." *Id.* at § 9544(a)(2). A PCRA claim is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding." *Id.* at § 9544(b). Further, we no longer apply the relaxed waiver doctrine in capital PCRA appeals. *Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693, 700 (1998).

## I. Law of the Case Doctrine

██ Appellant first contends that the PCRA court violated the "law of the case" doctrine [9] by failing to hold an evidentiary hearing when such directive was implicit in our opinion in *Williams I,* and the Commonwealth expressly assented to the same. He emphasizes that at status conferences held in 2002 and 2005, the PCRA court indicated that it was granting an evidentiary hearing. According to Appellant, the PCRA court did not rule to the contrary until after the Commonwealth conceded to the grant of a new penalty hearing in June of 2006, and argued, for the first time, that the guilt phase claims should be resolved on the pleadings. Appellant maintains that an evidentiary hearing is warranted to assess the credibility of

9. The "law of the case" doctrine embodies the concept that a "court involved in the later phases of a litigated matter should not reopen questions decided by another judge of that same court or by a higher court in the earlier phases of the matter." *In re De Facto Condemnation and Taking of Lands of WBF Associates L.P.,* 588 Pa. 242, 903 A.2d 1192, 1207 (2006), citing *Commonwealth v. Starr,* 541 Pa. 564, 664 A.2d 1326, 1331 (1995).

the witnesses who provided affidavits in support of his PCRA petition.

We reject the contention that our ruling in *Williams I* required the PCRA court to hold an evidentiary hearing. The basis for our remand in *Williams I* was for the preparation of an adequate opinion, given the fact that the PCRA court set forth no independent analysis, and instead adopted the reasoning set forth in the Commonwealth's motion to dismiss to support the denial of PCRA relief. 782 A.2d at 522. As noted, we specified in *Williams I,* at 523, that the "PCRA court will be authorized to conduct such hearings as may be necessary or appropriate to the completion of this task, guided by the framework established in [*Roy Williams* ]." As we did not mandate that an evidentiary hearing be conducted, our ruling, on its own, did not oblige the PCRA court to take such action. Likewise, we do not find it improper for the Commonwealth to change its position regarding the necessity of an evidentiary hearing after it conceded that a new penalty hearing was warranted. However, as the determination regarding the necessity of an evidentiary hearing depends upon the nature of each claim raised, we shall revisit this inquiry, as necessary, when resolving the various issues presented. *See* Pa.R.Crim.P. 909(b)(2) (providing that if there are no genuine issues concerning any material fact, the defendant is not entitled to post-conviction collateral relief, and no legitimate purpose would be served by further proceedings, the PCRA court shall give notice to parties of the intention to dismiss the petition, and state in the notice the reasons for dismissal).

## II. Dismissal of Claims Due to Prejudicial Delay

■ Appellant next contends that the PCRA court erred in concluding that his claims were subject to dismissal due to prejudicial delay pursuant to 42 Pa.C.S. § 9543(b), because the ineffective assistance of counsel claims were raised five years after trial counsel's death.[10] Section 9543(b) provides:

10. We reiterate that Appellant's petition is deemed timely filed because it was his first PCRA petition, and was filed within one year of the effective date of the 1995 amendments to the PCRA.

Even if the petitioner has met the requirements of subsection (a), the petition shall be dismissed if it appears at any time that, because of delay in filing the petition, the Commonwealth has been prejudiced either in its ability to respond to the petition or in its ability to re-try the petitioner. A petition may be dismissed due to delay in the filing by the petitioner only after a hearing upon a motion to dismiss. This subsection does not apply if the petitioner shows that the petition is based on grounds of which the petitioner could not have discovered by the exercise of reasonable diligence before the delay became prejudicial to the Commonwealth.

42 Pa.C.S § 9543(b).

Appellant argues that this section cannot serve as the basis for dismissal because the statutory language expressly precludes dismissal of a petition absent a hearing on the Commonwealth's motion to dismiss. He submits that no such hearing was conducted, and that the Commonwealth has not sustained its burden of proving that the delay in filing the claims prejudiced its ability to either respond to the petition or retry Appellant. Finally, Appellant refutes the notion that his ineffectiveness claims should have been raised on direct appeal when trial counsel was alive and Appellant was represented by new direct appeal counsel.[11] He maintains that if he had raised the ineffectiveness claims in his direct appeal filed in 1990, trial counsel, who died on April 21, 1991, would likely have already been deceased before any evidentiary hearing was conducted.

We agree with Appellant that dismissal pursuant to Section 9543(b) is not warranted here. While the Commonwealth presented argument based on that statutory provision in its motion to dismiss, the PCRA court did not conduct an eviden-

11. As noted *infra* at 14, Appellant's direct appeal took place prior to our decision in *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), which deferred ineffectiveness claims to collateral review; and instead was governed by this Court's previous rule, set forth in *Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687, 695 n. 6 (1977), which required claims of ineffective assistance of trial counsel to be raised at the first opportunity where an appellant has new counsel.

tiary hearing at which the Commonwealth demonstrated how it was prejudiced by Appellant's delay in raising the claims. This Court has ruled that, absent a hearing on the Commonwealth's motion to dismiss, Section 9543(b) specifically precludes the dismissal of a PCRA petition based upon prejudicial delay. *Commonwealth v. Hughes*, 581 Pa. 274, 865 A.2d 761, 776 (2004); *see also Commonwealth v. (Damon) Jones*, 590 Pa. 202, 912 A.2d 268, 290–91 (2006) (plurality) (lower court must conduct an evidentiary hearing on the defense of prejudicial delay in commencing post-conviction litigation prior to dismissing PCRA petition pursuant to Section 9543(b)). Thus, we conclude that dismissal of Appellant's petition on this basis alone is improper.[12] Nevertheless, Section 9543(b) was not the exclusive basis for the PCRA court's dismissal of Appellant's petition. Instead, the court reviewed the substance of Appellant's claims and found each of them to be without merit.

### III. Ineffective Assistance of Counsel

■■ Appellant's remaining claims allege the ineffective assistance of trial counsel and direct appeal counsel. It is well-established that counsel is presumed effective, and the defendant bears the burden of proving ineffectiveness. *Commonwealth v. Cooper*, 596 Pa. 119, 941 A.2d 655, 664 (2007). To overcome this presumption, Appellant must satisfy a three-pronged test and demonstrate that: (1) the underlying substantive claim has arguable merit; (2) counsel whose effectiveness is being challenged did not have a reasonable basis for his or her actions or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's deficient performance. *Commonwealth v. (Michael) Pierce*, 567 Pa. 186, 786 A.2d 203, 213 (2001). A claim of ineffectiveness will be denied

---

12. Appellant's delay in raising the ineffectiveness claims, may, however, become relevant in addressing the substance of individual claims. Specifically, trial counsel's death may render Appellant's task of satisfying his burden of proving counsel's ineffectiveness more difficult. *See Commonwealth v. Steele*, 599 Pa. 341, 961 A.2d 786, 820 (2008) (holding that while a PCRA petitioner's burden to prove ineffectiveness is made more difficult due to the passage of time and resultant memory loss, the petitioner's burden is not obviated or lessened by these circumstances). Such notion, however, is independent of an analysis of Section 9543(b).

if the petitioner's evidence fails to meet any of these prongs. *Id.* at 221–222.[13]

In *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), this Court abrogated the rule that ineffectiveness claims based on trial counsel's performance must be raised at the first opportunity where appellant has new counsel, *see Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687, 695 n. 6 (1977), and held that a defendant "should wait to raise claims of ineffective assistance of trial counsel until collateral review." *Grant*, 813 A.2d at 738. That holding, however, does not apply to the instant case because Appellant's direct appeal concluded prior to our decision in *Grant*. *Rainey*, 928 A.2d at 225. Under these circumstances, we shall analyze Appellant's ineffectiveness claims under the pre-*Grant* framework. *Id.*

We keep in mind, however, that in *Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014 (2003), this Court addressed the proper layering of a claim of ineffective assistance of counsel and held that a PCRA petitioner must present argument as to each layer of ineffectiveness, establishing all three prongs of the ineffectiveness standard for each attorney. *Id.* at 1022. Because this Court had not been entirely clear as to what was required of a PCRA petitioner seeking to plead and prove a layered claim of ineffectiveness before *McGill*, we stated that "a remand to the PCRA court may be appropriate for cases currently pending in the appellate courts where the petitioner has failed to preserve, by pleading and/or presenting, a layered ineffectiveness claim in a manner sufficient to warrant merits review." *Id.* at 1024. A remand is unnecessary, however, where the post-conviction petitioner fails to "thoroughly plead and prove" the underlying allegation that

---

**13.** In *Commonwealth v. (Charles) Pierce*, 515 Pa. 153, 527 A.2d 973 (1987), this Court recognized that the test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), is the proper test to evaluate ineffectiveness claims raised under the Pennsylvania Constitution. While the Pennsylvania test for ineffectiveness is the same as *Strickland's* two-part performance and prejudice standard, in application, this Court has characterized the test as tripartite, by dividing the performance element into two distinct parts, *i.e.*, arguable merit and lack of reasonable basis. *Commonwealth v. Rainey*, 593 Pa. 67, 928 A.2d 215, 225 n. 8 (2007).

trial counsel was ineffective. *Commonwealth v. D'Amato,* 579 Pa. 490, 856 A.2d 806, 812 (2004).

### IV. Conflict of Interest

 Appellant first claims that trial counsel was ineffective because he was burdened by a conflict of interest. This claim was not raised on direct appeal when Appellant was represented by new counsel and is therefore waived.[14] *See* 42 Pa.C.S. § 9544(b). Appellant further maintains, however, that appellate counsel was ineffective for failing to preserve the conflict of interest issue on appeal. In order to determine whether there is arguable merit to the claim of appellate counsel ineffectiveness, we examine the substance of the underlying claim.

Specifically, Appellant claims that trial counsel provided ineffective assistance due to a conflict of interest arising from his acceptance of legal fees from Appellant's paramour, Erica Riggins. He contends that Riggins' payment of fees precluded trial counsel from presenting Riggins' testimony in support of an alternative defense that Appellant shot the victim by accident, instead of pursing the defense that Riggins, and not Appellant, was the perpetrator. Appellant relies upon Riggins' declaration, which asserts that she informed trial counsel that she wanted to testify on Appellant's behalf, but that trial counsel would not call her as a witness because she had paid $5,000 toward Appellant's legal fees. Riggins' proffered testimony was corroborated, in part, by the declarations submitted by Appellant's mother, Joyce Carter, and his other paramour, Jean Hargrove.[15] Appellant additionally suggests, without elaboration, that trial counsel withheld unspecified legal services due to the non-payment of his total fee.

---

**14.** Appellant's conflict of interest claim is couched solely in terms of ineffectiveness of counsel and does not allege any trial court error.

**15.** The declaration of Carter asserted that Appellant told her the shooting was an accident, and that trial counsel told Carter to pay her son's legal fees to avoid a conflict arising from the payment of fees by Hargrove and Riggins. Hargrove's declaration contained similar information regarding the accidental nature of the shooting and trial counsel's quest for fees. Hargrove also asserted that she paid trial counsel $7,000 towards Appellant's legal fees; that counsel refused to investigate the case unless he was paid more; and that counsel did not want Riggins "involved" because she had paid Appellant's legal fees.

In *Mickens v. Taylor*, 535 U.S. 162, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002), the United States Supreme Court held that until a defendant demonstrates that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance of counsel under the Sixth Amendment. *Id.* at 175, 122 S.Ct. 1237. The Court defined "actual conflict of interest" for Sixth Amendment purposes as a conflict of interest that adversely affects counsel's performance. *Id.* at 171, 122 S.Ct. 1237.[16]

Here, there is no factual basis for the claim that a conflict of interest arose from Riggins' payment of Appellant's legal fees. It would be simply illogical to conclude that trial counsel was acting in furtherance of Riggins' interests (and adverse to Appellant's interests) when he pursued the defense that Riggins was the perpetrator. While Appellant may fault trial counsel for the defense strategy chosen, he has failed to demonstrate that such strategy constituted ineffectiveness resulting from a conflict of interest in accepting fees from Riggins. It is likely that trial counsel decided not to call Riggins as a witness because her testimony would have confirmed the Commonwealth's theory that Appellant was shooting at Riggins when he mistakenly killed the victim. Further, counsel has failed to identify any particular legal services that were purportedly withheld due to lack of payment of fees. Accordingly, assuming the facts as alleged by Appellant, there is no arguable merit to the claim of trial counsel ineffectiveness and the corresponding claim of appellate counsel ineffectiveness fails.[17, 18] Thus, the PCRA court did not err in failing to hold an evidentiary issue on the conflict of interest claim.

16. Appellant additionally suggests that prejudice is presumed when a claim of ineffective assistance of counsel is based on an actual conflict of interest. Given our conclusion that there is no factual basis for the conflict of interest claim, however, we need not entertain Appellant's contention in this regard.

17. Moreover, even assuming there was merit to the underlying claim, Appellant has presented no evidence that Riggins informed appellate counsel that trial counsel improperly accepted legal fees. Thus, appellate counsel had no reason to investigate or present such claim on such claim on appeal.

18. Our holding is limited to determining that trial counsel was not

## V. Charge on Third Degree Murder

██ Appellant next contends that trial counsel rendered ineffective assistance by failing to object to the jury charge defining third degree murder. This claim is waived because it was not raised on direct appeal. *See* 42 Pa.C.S. § 9544(b). Appellant, however, additionally contends that appellate counsel was ineffective for failing to raise this issue on appeal.[19] Accordingly, we shall examine the merits of the claim of trial counsel ineffectiveness solely for purposes of evaluating the derivative claim of appellate counsel ineffectiveness.

Appellant argues that the trial court's instruction on third degree murder misinterpreted Section 2502 of the Crimes Code [20] and was improper on two grounds: (1) the instruction

ineffective for laboring under a conflict of interest as no conflict existed. We do not address whether, if proven, Appellant's assertions regarding trial counsel's acceptance of fees constituted an ethical violation under Pennsylvania Rule of Professional Conduct 1.8(f), which precludes an attorney from accepting compensation for representation from someone other than the client, unless enumerated requirements are satisfied. *See Nix v. Whiteside*, 475 U.S. 157, 165, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) (providing that "[b]reach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel.").

19. Appellant further argues that PCRA counsel was ineffective for failing to include this issue in his PCRA petition. In his amended PCRA petition, however, Appellant challenged trial counsel's effectiveness for failing to object to the jury instructions on homicide and malice. *See* Appellant's Amended PCRA petition dated January 26, 2005 at 75. Thus, we need not reach the claim of PCRA counsel ineffectiveness.

20. Section 2502 defines the various degrees of murder and provides, in pertinent part:

(a) MURDER OF THE FIRST DEGREE.—A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.
(b) MURDER OF THE SECOND DEGREE.—A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony.
(c) MURDER OF THE THIRD DEGREE.—All other kinds of murder shall be murder of the third degree. Murder of the third degree is a felony of the first degree.

led the jury to believe that it could only find Appellant guilty of third degree murder if it found that he intended to inflict grievous bodily injury on another person and death resulted; and (2) the instruction precluded the jury from finding a verdict of third degree murder if it found that a malicious, intentional killing had occurred. According to Appellant, a killing could be malicious and intentional, yet nonetheless support a finding of third degree murder based on the lack of deliberation or premeditation. Appellant's Brief at 38.

We have held that "[w]hen evaluating jury instructions, the charge must be read as a whole to determine whether it was fair or prejudicial." *Commonwealth v. Robinson*, 583 Pa. 358, 877 A.2d 433, 444 (2005); *Commonwealth v. Hawkins*, 567 Pa. 310, 787 A.2d 292, 301 (2001). "The trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration." *Id.* There is error only when the trial court abuses its discretion or inaccurately states the law. *Commonwealth v. Markman*, 591 Pa. 249, 916 A.2d 586, 613 (2007).

To evaluate Appellant's claim, we look to the trial court's instructions explaining the various degrees of murder. First, the trial court defined first degree murder, in relevant part, as follows:

> Murder of the first degree is a criminal homicide that is committed with a specific intent to kill. It is this specific intention to kill which distinguishes it from other degrees of murder. An intentional killing is a killing by means of poison or by lying in wait or by any other kind of willful, deliberate and premeditated act.

N.T. 6/16/88, at 457. The trial court briefly addressed the definition of second degree murder and indicated that it did

---

(d) DEFINITIONS.—As used in this section the following words and phrases shall have the meanings given to them in this subsection: "INTENTIONAL KILLING." Killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing.

18 Pa.C.S. § 2502(a)-(d).

not apply to this case. The court then defined third degree murder as follows:

All murder which is not murder of the first degree or murder of the second degree under the law shall be murder of the third degree and again the doctrine of transferred intent applies. What is that kind of definition of third degree murder? Third degree murder is an unlawful killing of another person with malice as I defined it for you but with an intention to inflict grievous bodily injury on another person and not to take human life and yet as a result of the infliction of an injury, death does result. So, third degree murder includes any unlawful killing of a human being with malice but where no intention to actually kill exists or can reasonably and fully be inferred from the circumstances. So, if there is an unlawful killing where there's wickedness of disposition, hardness of heart, cruelty, recklessness of consequences and a mind regardless of social duty but if no specific intention to kill can be inferred or collected, that is no intention to kill anyone can be inferred or collected from the facts, then the verdict should be guilty of murder in the third degree. Malice in murder of the third degree is the malicious design to do harm but not to kill. Third degree murder therefore is the unlawful taking of a human life with malice aforethought with no specific intention to kill another person but with the intention to inflict grievous bodily harm on another person and yet as a result of inflicting that injury death results.

*Id.* at 459-60.

After defining voluntary manslaughter, the trial court summarized the applicable law as follows:

Let me summarize the law regarding murder and manslaughter. Murder of the first degree is an unlawful, willful, deliberate and premeditated killing with malice. It is accompanied by a specific intent to kill. Murder of the second degree doesn't apply. Murder of the third degree includes all unlawful killings with malice but where no

intention to kill exists or can reasonably and fully be inferred from the circumstances. . . .

*Id.,* at 462.

Contrary to Appellant's contentions, when read in its entirety, we conclude that the trial court's instruction adequately and accurately explained to the jury the law regarding third degree murder. Appellant's first challenge is based on the assertion that the instruction improperly led the jury to believe that it could only find Appellant guilty of third degree murder if it found that he intended to inflict grievous bodily injury on another person, and death resulted. The trial court did not, however, expressly instruct the jury that such intent was mandatory for third degree murder, but instead included such intent as a valid means of establishing the requisite malice. *See Commonwealth v. Thomas,* 552 Pa. 621, 717 A.2d 468, 479–80 (1998) (holding that third degree murder requires malice, which may include an intent to cause serious bodily injury that results in death, but third degree murder does not require such intent because malice can also be established by a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences and a mind regardless of social duty, which indicates an unjustified disregard for the likelihood of death or great bodily harm, and an extreme indifference to the value of human life). Here, the trial court's instruction, when read as a whole, adequately informed the jury of the various ways of demonstrating the requisite malice in a manner sufficient to establish third degree murder. Moreover, the jury charge correctly explained that third degree murder "includes any unlawful killing of a human being with malice but where no intention to actually kill exists or can reasonably and fully be inferred from the circumstances." N.T. 6/16/1998, at 459. As this is an accurate statement of the law; the trial court did not err in charging the jury and prior counsel were not ineffective for failing to object or raise such claim on appeal. *See Commonwealth v. Busanet,* 572 Pa. 535, 817 A.2d 1060, 1075 (2002) (counsel cannot be deemed ineffective for failing to raise meritless challenge to jury instructions).

Appellant's second challenge is that the jury charge failed to note that a killing could be malicious and intentional, yet nonetheless support a finding of third degree murder due to the lack of deliberation or premeditation. This claim is unpersuasive because a killing committed with the specific intent to kill can never constitute third degree murder. To the contrary, as the trial court instructed, first degree murder is statutorily defined as an "intentional killing," which, in turn, is defined as "killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(a), (d). It is well-established that third degree murder is distinguishable from first degree murder in that only first degree murder requires the specific intent to kill. *Commonwealth v. Overby*, 575 Pa. 227, 836 A.2d 20, 24 (2003); *See also* 18 Pa.C.S. § 2502(a), (d). Thus, the underlying challenge to the jury instruction fails, the derivative claim of trial counsel ineffectiveness lacks arguable merit, and appellate counsel cannot be deemed ineffective for failing to raise the meritless claim on appeal.

## VI. Charge on Voluntary Manslaughter

Appellant next argues that trial counsel was ineffective for failing to object to the jury charge defining voluntary manslaughter because the charge failed to state that the Commonwealth bore the burden of proving the elements of the offense.[21] This claim is waived as Appellant did not raise it on direct appeal. *See* 42 Pa.C.S. § 9544(b). Appellant, however, further claims that appellate counsel was ineffective for failing to raise this issue on appeal.[22] Accordingly, we

21. Section 2503 of the Crimes Code provides that "[a] person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by: (1) the individual killed; or (2) another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed." 18 Pa.C.S. § 2503(a). Subsection (b) provides that a person also commits voluntary manslaughter if he intentionally kills another, but unreasonably believes the killing is justified. *Id.* at § 2503(b).

22. While Appellant additionally argues that PCRA counsel was ineffective for failing to include this issue in the PCRA petition, such claim was included in Appellant's amended PCRA petition. *See* Appellant's

shall examine the claim of trial counsel ineffectiveness for purposes of determining whether there is arguable merit to the claim of appellate counsel ineffectiveness.

Significantly, Appellant acknowledges that the trial court generally instructed the jury that the Commonwealth had the burden of proving the elements of the offense beyond a reasonable doubt.[23] He argues, however, that such instruction should have been repeated in the specific charge on voluntary manslaughter, as it was in the instructions given to the jury on other offenses. Appellant submits that because the jury was not informed that the Commonwealth bore the burden of proof in this regard, and because the trial court stated that "it is necessary that the circumstances indicate an absence of malice," N.T. 6/16/1988 at 460, the jury may have believed that Appellant was required to prove the absence of malice, which is necessary to demonstrate voluntary manslaughter.

When viewed in its entirety, it is undisputed that the trial court's charge clearly informed the jury that the Commonwealth had the burden of proving every element of the offenses charged beyond a reasonable doubt. *See Commonwealth v. Holloway,* 559 Pa. 258, 739 A.2d 1039, 1047–48 (1999) (rejecting claim that trial court erroneously neglected to instruct the jury that the Commonwealth had the burden of proving each and every element of the charged offenses beyond a reasonable doubt when trial court so instructed the jury). Appellant offers no support for the proposition that the

Amended PCRA Petition dated January 26, 2005 at 75 (alleging ineffectiveness of trial counsel based on the fact that "the voluntary manslaughter instructions relieved the Commonwealth of its burden of proof and failed to instruct on a critical feature of provocation and passion").

**23.** At the outset of its final charge, the trial court stated:

It is not the defendant's burden to prove that he is not guilty. Instead, it is the Commonwealth that always has the burden of proving each and every element of the crimes charged and that the defendant is guilty of those crimes beyond a reasonable doubt. A person accused of a crime is not required to present evidence in his own defense or to prove anything in his own defense. If the evidence that has been presented fails to meet the Commonwealth's burden, then your verdict must be not guilty.

N.T. 6/16/1988 at 445.

trial court is required to repeat such instruction each time it explains the elements of a different offense. As cogently noted by the Commonwealth, "[i]n light of the trial court's clear instructions that the Commonwealth bore the burden of proving every element of the crime, there is no reason to conclude that the jury would understand just the opposite with respect to the offense of voluntary manslaughter." Appellee's Brief at 47. Under these circumstances, Appellant's challenge to the voluntary manslaughter instruction fails. Thus, the claim that trial counsel was ineffective for failing to object to the instruction lacks arguable merit, and appellate counsel cannot be deemed ineffective for failing to raise the meritless claim on direct appeal.

## VII. Diminished Capacity

Appellant next argues that trial counsel was ineffective for failing to present a diminished capacity defense. He alleges that there was sufficient evidence supporting a diminished capacity defense, including his history of mental health problems, head injuries, and alleged child abuse;[24] but that trial counsel failed to conduct any type of pre-trial investigation to discover such information and, instead, pursued a misidentification defense based on contradictory testimony. This claim is waived as it was not raised on direct appeal. See 42 Pa.C.S. § 9544(b). Appellant further maintains, however, that appellate counsel was ineffective for failing to preserve the diminished capacity issue on appeal. In order to determine whether there is arguable merit to the

24. Appellant attached to his PCRA petition declarations in support of a diminished capacity defense. Most of the declarations were given by Appellant's family members and friends, and asserted that Appellant suffered from a traumatic childhood, sustained severe head injuries, and manifested persistent difficulties with distraction and control over his emotions. A report from Dr. Henry Dee, a licensed psychologist and neuropsychologist, indicated that, at that time, in 1996, Appellant suffered from organic cerebral impairment and undermined intellectual and social functions, which related to his lack of capacity to appreciate the criminality of his conduct. The report of Herbert Levit indicated similar conclusions.

claim of appellate counsel ineffectiveness, we examine the substance of the underlying claim.[25]

Diminished capacity is a limited defense, which does not exculpate the defendant from criminal liability entirely, but instead negates the element of specific intent. *Commonwealth v. Gibson*, 597 Pa. 402, 951 A.2d 1110, 1131–32 (2008) (citations omitted). Thus, a defendant asserting a diminished capacity defense admits responsibility for the underlying action, but contests the degree of culpability based upon his inability to formulate the requisite mental state. *Id.* at 1132. Consequently, where a defendant has denied committing a crime during his trial testimony, this Court has refused to find counsel ineffective for failing to present a defense that would have conflicted with such testimony. *Id., See also Commonwealth v. Spotz*, 587 Pa. 1, 896 A.2d 1191, 1218 (2006); *Commonwealth v. Hughes*, 865 A.2d at 788; *Commonwealth v. Williams*, 577 Pa. 473, 846 A.2d 105, 111 (2004); *Commonwealth v. Paolello*, 542 Pa. 47, 665 A.2d 439, 455 (1995).

Based on the aforementioned case law, the PCRA court ruled that trial counsel was not ineffective for failing to present the defense of diminished capacity because it was inconsistent with the misidentification defense actually presented. Appellant's claim, however, is not so readily dismissed.[26] First, Appellant did not deny committing the offense at trial, as he did not testify on his own behalf. The defense presented by trial counsel consisted of the presentation of testimony from four eyewitnesses, who stated that they observed Erica Riggins fire the fatal shots. Appellant is not

25. The Commonwealth asserts that this claim was not included in Appellant's PCRA petition. To the contrary, this claim appears in Paragraph 51 of Appellant's Amended PCRA Petition filed on August 14, 1997.

26. The PCRA court also found that dismissal of this claim would be warranted pursuant to Section 9543(b) of the PCRA as there is no way for the Commonwealth to counter this allegation because trial counsel is unavailable to question regarding the claim. As noted *supra* at 13, we find dismissal of the claim due to prejudicial delay unwarranted here as there was no hearing at which the merits of the motion to dismiss on this grounds were entertained.

contending that trial counsel should have presented the diminished capacity defense in addition to this misidentification defense; rather he is arguing that trial counsel should have presented the evidence of diminished capacity instead of the misidentification defense because the testimony of the defense witnesses was incompatible with Appellant's own version of the events, was internally inconsistent, and was contrary to the physical evidence.[27] Appellant further maintains that he repeatedly informed trial counsel that he killed the victim by accident, but that trial counsel disregarded such notion, and proceeded to present false defense testimony, without interviewing the witnesses prior to trial to discover the weaknesses in their testimony.

While Appellant's claim raises serious allegations, he offers little by way of proof. First, as trial counsel is deceased and none of the defense witnesses has recanted their testimony, the only evidence supporting the patent falsity of the defense presented is Appellant's self-serving statement. Moreover, Appellant does not explain why he silently sat through the 1988 trial while counsel presented an "entirely false defense," and waited until 1996 to first challenge the strategy in a PCRA petition. Further, Appellant's own claim of ineffectiveness is internally inconsistent in that he implies that trial counsel fabricated the defense, yet recognizes that trial counsel did not have an opportunity to even interview such witnesses adequately as they surfaced on the eve of trial. *See* N.T. 6/15/1988, at 285–86 (trial counsel indicating to the court that he had never seen the witnesses before the morning of trial and was unaware of one of the witness' existence until that day).

27. When giving their individual accounts of the murder, the defense eyewitnesses did not place Appellant, the victim, and Erica Riggins at the same precise locations. They were also inconsistent regarding the placement or existence of Riggins's blue Cadillac at the scene, and whether Riggins was inside the vehicle when she purportedly fired the fatal shots. Moreover, some testimony indicated that the victim was facing Riggins when the shots were fired, which is inconsistent with the physical evidence establishing that the victim was shot in the back. Significantly, however, all the defense witnesses indicated that they observed Riggins shoot the victim, and that Appellant did not possess a weapon at that time.

In any event, this Court has held that counsel's strategic decision to seek acquittal rather than pursue a diminished capacity defense does not constitute ineffective assistance if there is a reasonable basis for the strategy chosen. *Commonwealth v. Spotz*, 896 A.2d at 1218. Faced with the late arrival of eyewitnesses who claimed that they observed someone other than Appellant kill the victim, trial counsel's strategy in presenting such evidence is eminently reasonable. We surmise that had trial counsel not presented the belated evidence of misidentification, and instead unsuccessfully pursued a diminished capacity defense, Appellant would now be arguing that trial counsel was ineffective for failing to present the misidentification evidence. In short, the fact that the defense employed was ultimately unsuccessful does not mean that trial counsel's performance was constitutionally deficient. *Commonwealth v. Rizzuto*, 566 Pa. 40, 777 A.2d 1069, 1085 (2001). As it is evident that trial counsel acted reasonably in presenting a misidentification defense, the claim of trial counsel ineffectiveness lacks merit, and the corresponding claim of appellate counsel ineffectiveness fails.[28]

*VIII. Lack of Specific Intent; Passion/Provocation Defense*

 Appellant next alternatively contends that trial counsel was ineffective for failing to present the defense that he lacked the specific intent to kill, not because of a mental impairment as he set forth in his previous claim, but because

**28.** The dissenting opinion finds that an evidentiary hearing is warranted on Appellant's claims that trial counsel failed to conduct a proper investigation and unilaterally staged the defense that Erica Riggins was the shooter. Respectfully, as noted, considering that trial counsel is now deceased, we fail to see the benefit of an evidentiary hearing as Appellant has not identified any witness who could establish that counsel, in fact, knowingly presented false witnesses in support of the misidentification defense. For example, Appellant has not submitted declarations from those eyewitnesses who testified on his behalf at trial that they falsely stated that Riggins was the shooter. Under these circumstances, even assuming the truth of the declarations provided, *i.e.*, that counsel failed to adequately investigate whether Appellant shot the victim by accident, it is not self-evident that trial counsel's alternative course of presenting the defense of misidentification was unreasonable. Thus, the grant of an evidentiary hearing would not aid in the development of Appellant's claim.

emotional pressure from his feuding paramours caused him to panic and fire his weapon towards the vehicle in which Riggins was riding. This claim is waived as it was not raised on direct appeal. *See* 42 Pa.C.S. § 9544(b). Appellant, however, further claims that appellate counsel was ineffective for failing to raise this issue on appeal.[29] Thus, we shall look to the substance of the underlying claim of trial counsel ineffectiveness in an attempt to determine whether there is arguable merit to the claim of appellate counsel ineffectiveness.

To elaborate, Appellant asserts that his two paramours, Riggins and Hargrove, had an increasingly violent history, and that Hargrove's family pressured him to protect Hargrove and his unborn child from any future harm. He explains that when he discovered that Riggins had returned to Hargrove's neighborhood, he panicked, and fired his gun solely to scare Riggins. Appellant contends that the physical evidence supports the view that he was not aiming directly at Riggins. He concludes that because the Commonwealth's evidence of specific intent to kill was weak and based on circumstantial evidence, trial counsel was ineffective for not presenting the defense that he lacked the specific intent to kill.

As we have already concluded that trial counsel had a reasonable strategy in pursing a misidentification defense, the claim that trial counsel was ineffective for failing to present the inconsistent defense of a lack of specific intent defense likewise fails.[30] As such, the instant claim of appellate counsel ineffectiveness lacks arguable merit.

29. While Appellant implies that the claim likewise did not appear in his PCRA petition, such categorization is inaccurate as the PCRA court explicitly addressed such contention and rejected it on the ground that the "passion/provocation" defense was inconsistent with the defense theory that Riggins was the perpetrator; and that Appellant had two days to "cool off" between the altercation between his paramours and the instant shooting.

30. Furthermore, Appellant's theory that trial counsel should have advocated that he committed a lesser offense has no support in the record. Essentially, Appellant is contending that trial counsel should have argued that his actions constituted voluntary manslaughter, instead of presenting the misidentification defense. Under the Crimes Code, a person is guilty of voluntary manslaughter if at the time of the killing he acted under a sudden and intense passion resulting from serious

392

## IX. Discrimination in Jury Selection

Appellant, who is African American, argues that the prosecutor utilized peremptory challenges to exclude jurors based on race, and gave pre-textural reasons to justify such challenges in violation of *Batson v. Kentucky, supra.* Trial counsel objected to the prosecutor's exercise of peremptory challenges during *voir dire,* but the claim was not advanced on direct appeal, and is therefore waived. *See* 42 Pa.C.S. § 9544(b). Appellant additionally claims, however, that appellate counsel was ineffective for failing to preserve the issue in his direct appeal. Thus, we shall examine the underlying *Batson* claim to determine whether Appellant has demonstrated that appellate counsel provided constitutionally deficient stewardship when he failed to raise the *Batson* claim in Appellant's direct appeal.

In *Batson,* the United States Supreme Court held that the Equal Protection Clause forbids a prosecutor from challenging potential jurors solely on account of their race. *Id.,* 476 U.S. at 89, 106 S.Ct. 1712. The framework for analyzing a *Batson* claim is three-fold:

[F]irst, the defendant must make a *prima facie* showing that the circumstances give rise to an inference that the prosecutor struck one or more prospective jurors on account of race; second, if the *prima facie* showing is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror(s) at issue; and third, the trial court must then make the ultimate determination of whether the defense has carried its burden of proving purposeful discrimination. *Batson,* 476 U.S. at 97, 106 S.Ct. 1712, 90 L.Ed.2d 69.

provocation by the victim. 18 Pa.C.S. § 2503(a). We have held that killings do not occur under the heat of passion where there was sufficient time for cooling between whatever provocation might have existed and the actual killings. *Commonwealth v. Walker,* 540 Pa. 80, 656 A.2d 90, 92 (1995), *citing Commonwealth v. Butler,* 446 Pa. 374, 288 A.2d 800, 802 (1972). Here, the alleged provocation, the violent confrontation between Riggins and Hargrove, occurred two days before the murder and would not serve to reduce the degree of guilt to manslaughter.

\* \* \*

■ The second prong of the *Batson* test, involving the prosecution's obligation to come forward with a race-neutral explanation of the challenges once a *prima facie* case is proven, "does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem,* 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). Rather, the issue at that stage "is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* [(quoting *Hernandez v. New York,* 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)(plurality opinion))].

If a race-neutral explanation is tendered, the trial court must then proceed to the third prong of the test, *i.e.,* the ultimate determination of whether the opponent of the strike has carried his burden of proving purposeful discrimination. *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769, 131 L.Ed.2d 834. It is at this stage that the **persuasiveness** of the facially-neutral explanation proffered by the Commonwealth is relevant.

*Commonwealth v. Cook,* 597 Pa. 572, 952 A.2d 594, 602–03 (2008) (emphasis supplied), *citing Commonwealth v. Harris,* 572 Pa. 489, 817 A.2d 1033, 1042–43 (2002).

The record establishes that after the prosecutor exercised six peremptory challenges to strike minority prospective jurors (five of whom were African American and one of whom was Hispanic), trial counsel objected, and contended that the challenges were racially motivated. The trial court then concluded that a *prima facie* case had been made out under the first prong of the *Batson* analysis, and proceeded to examine the second *Batson* prong by directing the prosecutor to state her reasons for striking the six minority venirepersons. *See* N.T. 6/9/1988 at 276. ("Without making any judgments, I think the *prima facie* case has been made out. . . . I think that I am required under the law now to ask the Commonwealth to explain the exercise of its peremptory challenges.").

The prosecutor individually addressed each of the six peremptory challenges (the first against a Hispanic and the remaining against African Americans) and offered the following explanations. The prosecutor struck Peremptory Number 1, Luis Alvarado, a Hispanic with a heavy accent, because the prosecutor feared Alvarado would be unable to understand the law as instructed by the court; Peremptory Number 2, Marlene Blackman, was struck because the prosecutor believed Blackman may not be able to judge fairly because the father of her daughter was in prison; Peremptory Number 3, Robin Jamison, was struck because she expressed a significant reluctance to the imposition of the death penalty; Peremptory Number 4, Georgette Baxter, was struck due to the fact that her brother was awaiting trial on weapons/robbery charges, which may have made it difficult for her to serve fairly; Peremptory Number 5, Barbara Carr, was struck because she rambled on during *voir dire* questioning, and provided answers inconsistent with the inquiries; and, Peremptory Number 6, Cynthia Collins, was struck due to her youth, as the prosecutor believed she may be unable to fairly consider the serious penalty sought in this case. The trial court expressly credited the prosecutor's race-neutral explanations for exercising the peremptory strikes and concluded that *Batson* had not been violated.[31]

Later in the *voir dire*, the prosecutor exercised a final peremptory challenge against African American Dewyne Johnson and, upon objection by trial counsel, the prosecutor explained that Johnson was struck because her manner did not appear consistent with her answers to the questions posed. The prosecutor further explained that Johnson may not have been able to serve fairly because she had been the victim of a robbery and the perpetrator had been acquitted at trial. The

31. The trial court stated:

> I really have to make a credibility judgment and I make it here and I accept the statements that [the prosecutor] has made and I accept that these are the basis for the challenges that she has exercised and I accept that it has not been done for the purpose of excluding black persons from this jury and as a result I do not find any violation of the defendant's right or any violations of law. . . .

N.T. 6/9/1988 at 284–285.

trial court again credited the prosecutor's response that the peremptory challenge was not based on race. *Id.* at 367. The final jury chosen consisted of ten Caucasians and two African Americans.

In support of his claim of discrimination in jury selection, Appellant reiterates that the prosecutor exercised seven peremptory strikes against six African Americans and one Hispanic, and struck no Caucasians. Specifically, he argues that the prosecutor's explanations for exercising these challenges against minority venirepersons were based on subjective considerations that were pre-textual, and could easily mask discriminatory intent. According to Appellant, the PCRA court erred in affording "absolute deference" to the trial court's acceptance of the race-neutral explanations for the strikes, "without ever making an independent determination of whether the trial court's findings were, in fact, based upon reliable and credible evidence." Appellant's Brief at 67. He maintains that the PCRA court should have examined the proposed testimony of David Zuckerman, Esquire, who conducted an analysis of voter registration lists, as well as the proposed testimony of other attorneys who had observed the Philadelphia District Attorney's Office engage in a general policy of discrimination in jury selection. Finally, Appellant concludes that appellate counsel had no reasonable basis for failing to raise this claim on appeal because there was a record made at trial and, therefore, an evidentiary basis existed from which a *Batson* claim could have been reviewed on appeal.

Upon examination of Appellant's claim, we have little difficulty concluding that he failed to demonstrate appellate counsel's ineffectiveness. This Court has recently reaffirmed the notion that a "trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal and will not be overturned unless clearly erroneous." *Cook,* 952 A.2d at 603, *citing Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). Such great deference is necessary because a reviewing court, which analyzes only the transcripts from *voir dire,* is not as well positioned as the trial court is to

make credibility determinations. *Id.* Moreover, there will seldom be much evidence on the "decisive question" of whether the race-neutral explanation for a peremptory challenge should be believed; the best evidence often will be the demeanor of the prosecutor who exercises the challenge. *Id.*

Considering the totality of the circumstances, we conclude that Appellant has failed to demonstrate that the trial court's decision on the ultimate question of discriminatory intent was clearly erroneous. The prosecutor's specific explanations were given moments after the peremptory strikes were exercised, and the trial court, who observed the demeanor of the prosecutor, made an express determination that the justifications for the peremptory strikes were both credible and race neutral. Each of the explanations offered refers to characteristics that relate to a prospective juror's ability to serve (*i.e.*, the inability to understand the law, prior exposure to the criminal justice system; reluctance to impose the death penalty; the inability to respond appropriately to questions asked; and youth, indicating a possible inability to comprehend the seriousness of the penalty sought) *See Id.*, 952 A.2d at 606 (recognizing that, to fulfill its obligation to rebut a *prima facie* case of discrimination in jury selection under *Batson,* the prosecution's explanation must be "clear and reasonably specific.").

Further, Appellant recognizes that two African Americans served on the jury, and fails to identify any statements made by the prosecutor indicating a racial bias. *See Id.*, at 607 (holding that circumstantial evidence, in addition to the prosecutor's explanation, may be probative in the ultimate determination of whether peremptory challenges were made for racial reasons); *see also Commonwealth v. Spotz,* 896 A.2d at 1213–14 (holding that, in evaluating a *Batson* claim alleging gender discrimination, a court may look to whether the prosecutor made any questionable remarks during jury selection). Finally, this Court has concluded that a general claim of a "culture of discrimination" in the Philadelphia District Attorney's Office is insufficient to demonstrate purposeful discrimination where the various assertions do not involve the prosecutor

who selected Appellant's jury and have no connection to his individual case. *Commonwealth v. Ligons*, 971 A.2d 1125, 1145 (Pa.2009); *Accord Commonwealth v. Uderra*, 580 Pa. 492, 862 A.2d 74, 87 (2004): *Commonwealth v. Lark*, 560 Pa. 487, 746 A.2d 585, 588–89 (2000); *Commonwealth v. Rollins*, 558 Pa. 532, 738 A.2d 435, 443 n. 10 (1999).

Under these circumstances, it was eminently reasonable for appellate counsel to forego the meritless *Batson* issue in favor of the claims he pursued on direct appeal. *See Commonwealth v. Clark*, 599 Pa. 204, 961 A.2d 80, 93 (2008) (counsel cannot be deemed in effective for failing to raise a meritless claim). As we conclude that, even if believed, Appellant's proffer fails to demonstrate purposeful discrimination in jury selection, the PCRA court did not abuse its discretion by refusing to conduct an evidentiary hearing on the *Batson* claim. *See* Pa.R.Crim.P. 909(b)(2), *supra* at 11.[32]

Accordingly, as we have concluded that all of Appellant's claims lack merit, we affirm the PCRA court's order denying him a new trial.

Chief Justice CASTILLE, and Justice EAKIN, Justice TODD, Justice McCAFFERY and Justice GREENSPAN join the opinion.

Justice SAYLOR files a dissenting opinion.

**32.** We note that the PCRA court alternatively rejected this claim based on Appellant's failure to preserve an adequate record pursuant to *Commonwealth v. Spence, supra.* Trial Court Opinion at 13. In *Spence*, we held that an appellant's failure to make an appropriate record for review of his *Batson* challenge rendered the court unable to consider his claim that the trial court failed to find a *prima facie* case under *Batson, i.e.,* the first of the three prongs required to establish a *Batson* violation. To the contrary, the instant claim of discrimination in jury selection was preserved during *voir dire*, the trial court found a *prima facie* case under *Batson*, and the disputed issue is whether the explanations offered by the prosecutor to explain the peremptory strikes were pre-textual. Further, the Commonwealth does not rely upon or even cite *Spence* in its appellate brief, and does not contend that there is an inadequate record upon which to review Appellant's challenge to the prosecutor's race-neutral explanations for the strikes. Under these circumstances, we decline to invoke *Spence* as the basis for rejection of Appellant's *Batson* claim.

398

Justice SAYLOR, dissenting.

I join Parts I, II, III, and VIII of the majority opinion, but I have differences with the reasoning contained in the other parts, and I do not support the affirmance of the dismissal and/or denial of all guilt-phase claims at this stage. Rather, I would remand for an evidentiary hearing concerning material factual matters implicated by Appellant's proffers.

Pervading several of Appellant's claims is the allegation that his trial counsel conducted no investigation of guilt or penalty, but rather, focused his efforts on the extraction of fees from those concerned about Appellant. Appellant alleges that he always admitted to having fired the shot that killed the victim, albeit without any intention of harming anyone, but that trial counsel unilaterally staged the defense that Erica Riggins was the shooter. Appellant's proffer includes his own declaration, *see*, Declaration of Craig Williams at ¶ 9 ("I admitted to [trial counsel] that when I came around the corner and I saw Erica's car I was in a panic and fired the gun. I told [trial counsel] that I was not trying to hurt Mr. Pepper, Erica, or anyone else."), as well as one from eyewitness Erica Riggins. *See* Declaration of Erica Riggins at ¶ 3–4 (indicating the witness told trial counsel that Appellant was the shooter and the killing was an accident). Ms. Riggins' declaration also supports the claim of a lack of a meaningful investigation, as, for example, it includes the following narrative:

> [Trial counsel] and I met several times before the trial started when I would come by and give him money for Craig's case. We would speak very briefly as I gave him the money. I told him I knew Craig was not guilty of murder because I was there and it was an accident. But then he would not ask me any questions about what really happened. . . .
>
> . . . From the time that I gave [trial counsel] money, I let him know that I wanted to testify for Craig, so I could explain what really happened. He would say that if I was

to be a witness, he couldn't be Craig's lawyer and would have to give the money back. But I wanted to be a witness and tell what I knew for Craig. [Trial counsel] kept telling me to just get him paid....

Declaration of Erica Riggins at ¶¶ 3–4.

Appellant offered a similar statement from his mother:

[Trial counsel] only wanted to talk about his fees and how Erica Riggins and Jean Hargrove were going to pay him several thousand dollars in addition to the $5,000 he had already received from them. He told me I should also pay him, because there was some kind of "conflict" with him getting all his money from them. It did not make sense to me. Later, I would try to visit [trial counsel] to find out about my son's case, but [counsel] would not be around when I went to his office. I only saw [him] on one or two occasions. He never sat down and interviewed me about my son. He only seemed to want to talk about getting more money than what, by then, had been several thousand dollars he had gotten from Erica and Jean.

Not once during any of my visits to [trial counsel's] office did he or anyone working with him speak to me about Craig's case.... He did not ask me anything about Craig or about the situation and fights between Erica and Jean or about Craig's life.

Declaration of Joyce Carter at ¶ 17. The declaration of Jean Hargrove includes the following:

I paid [trial counsel] and Erica Riggins paid him, so [trial counsel] knew how to reach us. But he never interviewed us about the case before trial. At one point, I told him he needed to interview Erica. He said that Erica had paid him so he did not want Erica involved. I told him he should at least interview me about what happened. He said he would do this later, but as time went by it became clear he never intended to interview me. He would not take my phone calls or give me an appointment.

Declaration of Jean Hargrove at ¶ 16. Several other witnesses, including Appellant's father and other family members purporting to possess information relevant to the defense of guilt and/or penalty, submitted declarations indicating they were never interviewed by trial counsel.

Based on this line of information, Appellant argues, among other things:

It is believed and averred that when [trial counsel] was unable to squeeze anymore [sic] funds from Ms. Hargrove, Ms. Riggins or Appellant's family, he simply took the lines of least resistance. He raised a perfunctory defense, discussed below, which took the least amount of money, effort and work, rather than raising a real and appropriate defense which would have required his spending considerable time thoroughly interviewing all the witnesses well in advance of the trial, obtaining historical information and documentation about the Appellant and retaining experts. Counsel's only "tactic" was to avoid doing any work on this case in order to maximize the profit he ultimately received from the ever increasing fee that he was repeatedly asking his client's mother, Ms. Hargrove and Ms. Riggins to pay.

Brief for Appellant at 33.

Notably, it is also indisputable that, on facts the PCRA court and this Court were and are required to accept at the pre-hearing stage, Appellant was substantially underrepresented in his direct appeal, since his appellate counsel submitted a declaration indicating that he did not investigate any extra-record claims such as ineffectiveness matters. *See* Affidavit of Appellate Counsel, at ¶¶ 3–6.[1]

---

1. The law as of the time of Appellant's direct appeal required direct-appeal counsel to investigate and litigate extra-record claims on pain of waiver. *See Commonwealth v. Grant,* 572 Pa. 48, 66, 813 A.2d 726, 737 (2002) (explaining that, under the rule pertaining at the time of Appellant's trial, appellate counsel had the "burden of raising any extra-record claims that may exist by interviewing the client, family members, and any other people who may shed light on claims that could have been pursued before or during sentencing"). Thus, appellate counsel's declaration in the present case, if believed, demonstrates that his stewardship was clearly deficient.

The standard which used to govern the availability of a post-conviction hearing, and the one I believe is embodied in our Rules of Criminal Procedure, distilled to whether the petitioner has proffered evidence which, if believed, would implicate relief. *See* Pa.R.Crim.P. 909(B). Although I recognize this standard has been supplanted in some cases with an appellate-level credibility assessment, *see, e.g., Commonwealth v. Carson*, 590 Pa. 501, 556–57, 913 A.2d 220, 251–52 (2006); *Commonwealth v. Bryant*, 579 Pa. 119, 154–57, 855 A.2d 726, 748 (2004), in the present case, I believe Appellant's proffer paints a sufficiently disturbing picture to warrant an evidentiary hearing.[2] I also maintain my belief that the PCRA courts should consistently err on the side of hearing the evidence and rendering supported factual findings and legal conclusions. *See, e.g.,* Carson, 590 Pa. at 616–18, 913 A.2d at 288–89 (Saylor, J., dissenting); Bryant, 579 Pa. at 162–64, 855 A.2d at 751–52 (Saylor, J., dissenting). The alternative is that the availability of hearings in post-conviction matters will depend on different judges' individual thresholds for making credibility assessments without actually hearing the witnesses, and thus, the administration of justice will be uneven.

---

**2.** I do recognize that there are good reasons to question Appellant's version of the events, including that his primary witnesses are interested persons. Additionally, trial counsel is alleged to have done nothing in terms of investigation, yet he produced several witnesses from the local neighborhood at trial who testified that Erica Riggins was the shooter. *See* N.T., June 15, 1988, at 244–278 (testimony of Charlene McDaniels, Jamal Morrison, and Mary Morrison). There is thus a fair inference to be made that someone assisted counsel in identifying such witnesses. Such inferences, however, implicate basic matters of credibility which are properly resolved via fact finding.