J-A11014-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| JARED DONOVAN JONES | |
| Appellant | No. 1297 MDA 2017 |

Appeal from the Judgment of Sentence Entered March 22, 2017
In the Court of Common Pleas of Lebanon County
Criminal Division at No: CP-38-CR-0000424-2016

BEFORE:  STABILE, NICHOLS, and PLATT,* JJ.

MEMORANDUM BY STABILE, J.:                **FILED SEPTEMBER 24, 2018**

Appellant, Jared Donovan Jones, appeals from the March 22, 2017

judgment of sentence imposing life imprisonment without the possibility of

parole for first-degree murder.  We affirm.

The trial court summarized the pertinent facts:

> This case arises from events that occurred on September 19, 2015 at Vinny's Good Time Night Club (hereafter "Vinny's") in the city of Lebanon.  About ten minutes before the club was scheduled to close, a dispute erupted between Richard Kinnard, II (hereafter "Kinnard"), [Appellant], and a security officer employed by Vinny's.  The defendants were ejected from the premises.  After a short hiatus, Kinnard returned to the nightclub.  Shots were fired.  Corey Bryan (hereafter "Bryan") was struck and killed.  Despite the fact that Vinny's was crowded when the shooting occurred, most patrons left the premises at or before the arrival of police.  No one professed to have seen the shooting.  An

---

* Retired Senior Judge assigned to the Superior Court.

investigation ensued. Eventually, that investigation was chronicled in a jury trial that took place in February of 2017.

The centerpiece of the Commonwealth's case in chief was footage from a videotape surveillance system at Vinny's. The videotape showed Kinnard and [Appellant] engaged in an argument with security officer Bryan. The tape also depicted Kinnard and [Appellant] leaving Vinny's and entering the parking lot. Shortly thereafter, the video depicted Kinnard returning to the bar entrance. Another camera showed Bryan at the door toward which Kinnard had been walking. The video depicted Bryan clutching his stomach and falling to the ground. Thereafter, most patrons scurried away. Kinnard was caught on video running to a car. None of the camera views depicted the shooter or anyone else in possession of a firearm.

Vinny's surveillance system showed Kinnard enter a car in the parking lot. The car then departed the parking area and turned north on Route 343. Shortly thereafter, North Lebanon Township Police were called to the scene of a one vehicle accident north of the City of Lebanon. Sergeant Timothy Knight of the North Lebanon Township Police Department arrived at the scene of the crash, which was approximately two miles from Vinny's. When he arrived, no one was present in the vehicle. Upon additional investigation, Sergeant Knight learned that the vehicle was registered to William Kinnard. Blood was located throughout the vehicle. Wedged in behind the right rear headrest was a gun. Sergeant Knight checked the serial number of the firearm and learned that it had been stolen. When the vehicle was subsequently processed more completely, police also found a payment receipt for a loan registered to Kinnard, a medical paper pertaining to Kinnard, a letter from the Harrisburg Area Community College addressed to [Appellant], an LA Fitness paper in the name of Kinnard, a MoneyGram with Kinnard's name on it, health documents from Memorial Hospital pertaining to Kinnard, and insurance paperwork in the name of Patty Kinnard.

The gun found inside the BMW vehicle was sent for ballistics testing. In addition, bullets were found inside Vinny's and a projectile was recovered from the body of Bryan. Trooper Todd Neumyer, a firearms expert with the Pennsylvania State Police, testified that the bullets recovered from the body of Bryan and Vinny's were fired from the gun that had been located in the BMW vehicle that crashed.

The parties reached a stipulation that the blood recovered from the BMW vehicle was transmitted to the Pennsylvania State Police Crimes Laboratory for serology and DNA testing. There, a forensic DNA scientist by the name of Sabrine Panzer-Kaelin completed testing that revealed the existence of blood from Kinnard and [Appellant] inside the crashed BMW vehicle.

Following the crash of their BMW vehicle, both [Appellant] and Kinnard left the area. . . . With respect to [Appellant], Detective [Keith] Uhrich communicated with his mother and his sister. On January 27, 2016, [Appellant] was apprehended in Hershey, Pennsylvania.

Following his apprehension, [Appellant] provided a recorded statement to police. This statement became the focus of extensive pre-trial litigation[.] Eventually, the court crafted a statement that could be read to the jury. This statement incorporated some of [Appellant's] own words and some paraphrasing. The statement of [Appellant] read to the jury focused upon the conduct of [Appellant] and not the conduct of Kinnard. Specifically, [Appellant] admitted that he was at Vinny's on the night of the murder. He admitted that he had an argument with Bryan. He admitted that he drove the BMW vehicle belonging to William Kinnard away from Vinny's. He acknowledged that he crashed the vehicle. After regaining consciousness following the crash, [Appellant] acknowledged that he left the scene of the accident and that he left Lebanon County. In the statement, [Appellant] denied having any knowledge or connection to the shooting death of Bryan.

Trial Court Opinion, 7/17/17, at 5-8 (record citations and some capitalization omitted).

At the conclusion of a lengthy joint trial, the jury found Appellant guilty of first-degree murder, third-degree murder, two counts of aggravated assault, flight to avoid apprehension, and five counts of conspiracy.[1] Appellant

---

[1] 18 Pa.C.S.A. § 2502(a) and (c), 2702, 5126, and 903, respectively.

filed a timely post-sentence motion, which the trial court denied on July 17, 2017.  This timely appeal followed.  Appellant raises nine assertions of error:

1. Did the trial court err in trying Appellant together with co-defendant [Kinnard]?

2. Did the trial court err in admitting into evidence the recorded telephone conversation between Charles Williams and [Kinnard]?

3. Did the trial court err in allowing the jury to hear the recorded telephone conversation between Charles Williams and [Kinnard]?

4. Did the trial court err in failing to instruct the jury that the recorded telephone conversation between Charles Williams and [Kinnard] could not be considered as evidence against Appellant?

5. Did the trial court err in presenting a summarized version of Appellant's statement to the police rather than allow the jury to hear or read Appellant's statement in its original form?

6. Did the trial court err in refusing to give the voluntary intoxication defense instruction for Appellant?

7. Did the trial court err in refusing to compel [Kinnard] to provide handwriting exemplars?

8. Did the trial court err in denying Appellant's post-sentence motion challenging the sufficiency of the evidence?

9. Did the trial court err in denying Appellant's post-sentence motion challenging the weight of the evidence?

Appellant's Brief at 4 (reordered).

Appellant argues issues one through five together.  Appellant's Brief at 13-16.  Appellant cites only one case, ***Bruton v. United States***, 391 U.S. 123 (1968), in which the United States Supreme Court held that the facially incriminating confession of a non-testifying defendant is inadmissible against

a co-defendant regardless of a limiting instruction to the jury. Here, the trial court prepared a summary of a statement, made by Appellant to police, in order to omit any reference to Kinnard that would have been inadmissible against him. Subsequent to *Bruton*, courts have been admitting a non-testifying defendant's confession into evidence so long as direct references to another co-defendant are appropriately edited. For example, in *Commonwealth v. Travers*, 768 A.2d 845 (Pa. 2001), the Pennsylvania Supreme Court held that a confession edited to refer to a co-defendant as "the other man," accompanied by a limiting instruction, was appropriate under *Bruton*.

In our view, *Bruton* is merely a beginning point for analysis of several of Appellant's assertions of error, but Appellant relies on *Bruton* for the entirety of his analysis. Appellant does not develop any legal argument regarding Pennsylvania law on severance motions, the admissibility of evidence, jury instructions, or the standards governing our review of those issues. In the three pages of argument that Appellant devotes to these five distinct assertions of error, Appellant does not specify which portion or portions of the trial court's summary were inadmissible under *Bruton*, nor does he indicate precisely how the trial court's summary was prejudicial to him. Similarly, Appellant fails to specify which portion or portions of Kinnard's recorded phone call were prejudicial to him, and how so. In summary, Appellant has failed to develop any argument upon which we can grant relief.

Next, Appellant claims the trial court erred in refusing to permit him to offer a voluntary intoxication defense. Ordinarily, voluntary intoxication, or diminished capacity, is not a defense in Pennsylvania. 18 Pa.C.S.A. § 308. In cases of murder, however, a defendant may offer evidence of intoxication if it is "relevant to reduce murder from a higher degree to a lower degree of murder." *Id.* "Thus, a defendant asserting a diminished capacity defense admits responsibility for the underlying action, but contests the degree of culpability based upon his inability to formulate the requisite mental state." ***Commonwealth v. Williams***, 980 A.2d 510, 527 (Pa. 2009), ***cert. denied***, 560 U.S. 940 (2010). "Consequently, where a defendant has denied committing a crime during his trial testimony, this Court has refused to find counsel ineffective for failing to present a defense that would have conflicted with such testimony." *Id.*

Appellant cites only one case, ***Williams***, in support of his argument. He claims, based on ***Williams***, that a defendant is entitled to a voluntary intoxication defense so long as he does not deny committing the crime during his own testimony. ***Williams*** does not support such a broad proposition. In that case, the PCRA court found that counsel was not ineffective for failing to assert a diminished capacity defense because that defense was inconsistent with the misidentification defense defendant offered at trial. *Id.* at 527. The Supreme Court observed that the question was more complicated, because Appellant alleged on collateral review that he admitted to counsel that he killed

the victim by accident, but counsel insisted on presenting a misidentification defense based on falsified testimony. *Id.* at 527-28. Thus, a diminished capacity defense would have been available to the defendant had counsel proceeded with defendant's accidental killing theory. The Supreme Court affirmed the denial of the defendant's petition because he failed to prove the allegations in his petition, and because, given the evidence of record, counsel had a reasonable strategic basis for seeking acquittal rather than diminished capacity. *Id.*

We find no support in *Williams* for Appellant's argument. That is, *Williams* did not hold that a defendant could assert a diminished capacity defense so long as he does not take the stand and testify to his own innocence. To the contrary, the *Williams* Court wrote that a defendant asserting the diminished capacity defense admits culpability for the underlying crime, but contests the degree of culpability. *Id.* at 527. Instantly, Appellant's defense was that Kinnard was responsible for the murder. The trial court explained:

> In this case, [Appellant] has clearly denied any culpability for the killing of Corey Bryan. In a statement to police that was read to the jury, [Appellant] stated that he was in a car at the time of the shooting, he stated that he did not hear any shots fired, he stated that he did not have any role in bringing a gun to the nightclub, and he stated that he did not even know that anyone else in his car possessed a gun or shot someone. In addition, [Appellant] presented evidence in the form of a letter written by Defendant Kinnard that completely exculpated him from any involvement in the shooting. Clearly, [Appellant] has asserted innocence. Because of this, [Appellant] cannot take advantage of the diminished capacity defense.

Trial Court Opinion, 2/13/17, at 7. Given the foregoing, we conclude that the trial court correctly refused to allow Appellant to present a diminished capacity defense.

Additionally, we observe that "[i]ntoxication . . . may only reduce murder to a lower degree if the evidence shows that the defendant was 'overwhelmed to the point of losing his faculties and sensibilities.'" *Commonwealth v. Blakeney*, 946 A.2d 645 (Pa. 2008) (quoting *Commonwealth v. Breakiron* 571 A.2d 1035, 1041 (1990)), *cert. denied*, 555 U.S. 1177 (2009). Appellant fails to cite any evidence to support a conclusion that he was sufficiently intoxicated in this case.

Next, Appellant argues that the trial court erred in denying his motion to compel handwriting exemplars from Kinnard. Appellant wished to have a handwriting expert authenticate letters in Appellant's possession that Kinnard allegedly authored. Once again, Appellant's citation to pertinent authority is sparse. He cites *Gilbert v. California*, 388 U.S. 263 (1967), and *Commonwealth v. Moss*, 334 A.2d 777 (Pa. Super. 1975), for the general proposition that compelled production of handwriting exemplars does not violate a defendant's right against self-incrimination under the United States and Pennsylvania Constitutions. Appellant's Brief at 18. Appellant argues that his expert's conclusion as to the authenticity of the letters Appellant introduced into evidence was not as definitive as it might have been.

The record reveals that the Commonwealth provided Appellant's counsel with letters that Kinnard wrote while Kinnard was incarcerated, and Appellant provided those letters to his expert. N.T. Hearing, 12/19/16, at 19. The expert used those letters as a basis for comparison, and she testified at trial that the signatures were consistent and that there was a strong probability that the same person authored all of the letters. N.T. Trial, 2/9/17, at 516-30. The trial court found that the letters Appellant wished to introduce into evidence were authentic, and the trial court admitted them. Given the foregoing, we do not understand how the trial court's refusal to compel exemplars prejudiced Appellant. Appellant simply fails to acknowledge that the Commonwealth provided letters admittedly authored by Kinnard, and that his expert relied on those as a basis for comparison. We discern no error in the trial court's ruling.

Next, Appellant challenges the sufficiency of the evidence in support of his conviction. We must therefore determine "whether the evidence, viewed in the light most favorable to the Commonwealth as the verdict winner, supports the jury's finding that every element of the offense was proven beyond a reasonable doubt." *Commonwealth v. Hicks*, 156 A.3d 1114, 1123 (Pa. 2017). "The Commonwealth may sustain this burden by wholly circumstantial evidence and the jury is free to believe all, part, or none of the evidence." *Id.* "To obtain a first-degree murder conviction, the Commonwealth must demonstrate that a human being was unlawfully killed,

the defendant did the killing, and the defendant acted with a specific intent to kill." *Commonwealth v. Markman*, 916 A.2d 586, 597 (Pa. 2007). Moreover, the jury may convict the defendant as an accomplice so long as the facts adequately support the conclusion that he or she aided, agreed to aid, or attempted to aid the principal in planning or committing the offense, and acted with the intention to promote or facilitate the offense." *Id.* Appellant argues that the Commonwealth failed to prove the intent element for any of his convictions. He cites *Markman* for the proposition that "simply knowing about the crime or being present at the scene is not enough." *Id.* at 598.

The trial court noted the following facts, all of which find support in the record:

- Video evidence [showed] that both [Appellant] and Kinnard were present at Vinny's on the evening of the homicide.

- Testimony from witnesses and through videotape that an argument ensued between [Appellant], Kinnard, and Bryan that resulted in the ejection of [Appellant] and Kinnard from Vinny's.

- Videotape evidence revealed that [Appellant] left Vinny's in a highly agitated state.

- The video depicted that [Appellant] and Kinnard left the club and proceeded to a car. Kinnard then was depicted coming back to the entrance of Vinny's. A separate camera depicted Bryan being shot at or near the time when Kinnard walked toward the entrance.

- The video depicted [Appellant] and Kinnard leaving Vinny's and proceeding north on Route 343.

- A BMW vehicle was involved in a one car crash approximately 2 miles to the north of Vinny's at or near the time when police were called to the scene of a shooting at Vinny's.

- The occupants of the vehicle fled from the scene of the crash.

- The BMW vehicle involved in the crash was registered to William Kinnard, who is a relative of Kinnard. Numerous documents were found in the vehicle that linked Kinnard to it. One document that was pertaining to [Appellant] was also found in the vehicle.

- Blood from both [Appellant] and Kinnard was found inside the vehicle .

- A gun was located inside the vehicle. Ballistics testing linked this gun to bullets found in Vinny's and inside the corpse of Bryan.

- Following the crash of the BMW vehicle, both Kinnard and [Appellant] left the geographic area. Kinnard went to Arizona.

- [Appellant] provided a statement in which he acknowledged being present at Vinny's, he acknowledged being involved in an argument with Bryan and he acknowledged driving the BMW away from Vinny's. In his statement, [Appellant] also admitted that he left the scene of the crash and left the Lebanon area following the shooting.

Trial Court Opinion, 7/17/17, at 14-16 (some capitalization omitted).

Contrary to Appellant's argument, the record, read in light most favorable to the Commonwealth as verdict winner, establishes much more than Appellant's mere presence at the scene of Bryan's murder. Appellant, along with Kinnard, was ejected from Vinny's by Bryan. Appellant left Vinny's in an agitated state. Both men entered a BMW, where Kinnard retrieved a gun. Appellant waited in the car while Kinnard returned to Vinny's and fatally shot Bryan.[2] Appellant drove and eventually crashed the getaway car, and

_____

[2] One of the bullets from Kinnard's gun hit another patron but did not seriously injure her. This accounts for several of Appellant's convictions.

- 11 -

both men fled the jurisdiction. This evidence is more than sufficient to establish Appellant's intent to be an accomplice to the shooting.

Finally, Appellant argues the jury's verdict was contrary to the weight of the evidence. The law governing this issue is well settled:

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. It has often been stated that a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.
>
> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:
>
> Appellate review of a weight claim *is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.* Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Clay*, 64 A.3d 1049, 1054–55 (Pa. 2013) (emphasis in original).

Beyond the standard of review, Appellant's argument consists of a single paragraph in which he notes that the Commonwealth's case against him was circumstantial. Appellant claims that his convictions are contrary to the weight of the evidence because they are based on nothing more than surveillance video and Appellant's statement to police. Given the body of evidence we described in connection with Appellant's sufficiency of the evidence argument, we disagree. We discern no abuse of discretion in the trial court's decision not to grant Appellant a new trial.

Because we have found all of Appellant's arguments lacking in merit, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/24/2018