J-A16014-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| VANESSA  BROWN | : | |
| | : | |
| Appellant | : | No. 155 MDA 2019 |

Appeal from the Judgment of Sentence Entered November 30, 2018
In the Court of Common Pleas of Dauphin County
Criminal Division at No(s):  CP-22-CR-0000525-2015

BEFORE:  PANELLA, P.J., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:          **FILED NOVEMBER 30, 2020**

Vanessa Brown ("Brown") appeals from the judgment of sentence entered following her conviction of five counts of conflict of interest, one count of bribery, and one count of statement of financial interests.[1]  We affirm.

In 2010, Pennsylvania Attorney General Tom Corbett ("Attorney General Corbett") launched an undercover sting operation to ferret out public corruption in state government.  To facilitate that investigation, the Attorney General's Office obtained the cooperation of Tyron Ali ("Ali") by agreeing not to prosecute him for fraud if he assisted with the investigation.  Ali presented himself to members of the Pennsylvania legislature as a lobbyist seeking to advance legislation on behalf of his clients and willing to pay for it.   Ali

---

[1] *See* 65 Pa. C.S.A. § 1103(c), 18 Pa. C.S.A. § 4701(a)(1), and 65 Pa. C.S.A. § 1105(a).

captured several members of Philadelphia's state House delegation on tape accepting relatively modest cash payments in exchange for their votes on legislation. The evidence from the investigation – specifically, the tape recordings – resulted in the prosecution and conviction of these legislators. This appeal involves one of the legislators who was ensnared in the undercover sting operation.

Vanessa Lowry Brown ("Brown") was a member of the Pennsylvania House of Representatives. Like all elected officials, Brown needed to raise a significant sum of money for her upcoming election to scare off potential challengers. However, Brown struggled to raise the necessary funds. Fearing a contested election, Brown approached Ali for help with meeting her fundraising goal. Ali agreed to raise money for Brown's reelection campaign, but made clear that he expected Brown to promote his client's interests in Harrisburg. Brown responded by using her position as a legislator to assist Ali.

Over the next several months, Ali provided Brown with multiple cash payments to secure her vote on various pieces of legislation in the House. In one instance, Ali asked Brown to vote "no" on legislation requiring voters to show some form of identification at polling places. Brown voted against the voter identification measure in the House. Shortly after the vote, Ali appeared in Brown's office and handed her an envelope containing $2,000 in cash. Unbeknownst to Brown, Ali recorded the illegal transaction on tape.

Despite evidence that Brown had accepted money in exchange for favorable votes on legislation, Pennsylvania Attorney General Kathleen Kane ("Attorney General Kane") declined to charge Brown due to concerns about the investigation.[2] The Attorney General's Office then referred the case to the Philadelphia District Attorney's Office. Thereafter, Philadelphia District Attorney R. Seth Williams ("Williams"), in conjunction with Dauphin County District Attorney Ed Marsico ("District Attorney Marsico"), impaneled a grand jury to investigate the corruption allegations against Brown.

After hearing testimony from numerous witnesses, including Brown, and examining the evidence, the grand jury returned a presentment recommending criminal charges. The judge overseeing the investigating grand jury then directed the appropriate jurisdiction, Dauphin County, to file charges against Brown. The Dauphin County District Attorney's Office filed a Criminal Complaint charging Brown with the above-described crimes: five counts of conflict of interest, one count of bribery, and one count of statement of financial interests.

In the years that followed, a series of unexpected events upended and delayed the corruption case against Brown. Those events centered primarily on Williams pleading guilty to federal bribery charges. After Williams resigned

---

[2] Attorney General Kane succeeded Attorney General Corbett as attorney general.

from office, First Assistant District Attorney Kathleen Martin ("Acting District Attorney Martin") became the acting district attorney by operation of law. From there, Acting District Attorney Martin disclosed two conflicts of interest in the case. The first conflict concerned her former law firm representing Ali in negotiating a cooperation agreement with the Attorney General's Office. The second conflict Acting District Attorney Martin revealed was that her former law firm represented Williams in connection with the federal grand jury investigation that resulted in his guilty plea and resignation.

Brown filed a pre-trial Motion to disqualify the Philadelphia District Attorney's Office and the Dauphin County District Attorney's Office from prosecuting the case. In her Motion, Brown asserted that there were disabling conflicts of interest in the case. Specifically, Brown argued that the prosecutors from the Philadelphia District Attorney's Office, whom District Attorney Marsico appointed as special prosecutors in the case, reported to and took direction from Acting District Attorney Martin. The trial court granted the motion in part and denied it in part, disqualifying the special prosecutors from the Philadelphia District Attorney's Office, but not the Dauphin County District Attorney's Office. Brown filed an interlocutory appeal challenging the trial court's decision, and this Court quashed the appeal as premature.

The case proceeded to jury selection. There, the Commonwealth exercised five peremptory strikes, each one directed against non-white jurors. In particular, the Commonwealth excluded two black females from the jury.

Brown, who is black, objected that the peremptory challenges were discriminatory and illegal under **Batson v. Kentucky**, 476 U.S. 79 (1986). The trial court determined that Brown established a *prima facie* case of purposeful discrimination regarding one of the Black jurors. In response, the Commonwealth proffered race-neutral explanations for striking the juror. Ultimately, the trial court determined that the Commonwealth lacked discriminatory intent in striking the Black juror and overruled Brown's **Batson** objection.

Following jury selection, the Commonwealth presented former Chief Deputy Attorney General Frank Fina ("Fina") as a trial witness. Fina, who supervised the sting operation, testified on direct examination about the plea bargain offered to Ali in return for his work as an undercover confidential witness. Fina did not testify as to any personal observation of Brown, and he did not testify as to any facts that, absent the testimony of Ali, were relevant to Brown's guilt or innocence. On cross-examination, Brown sought to confront Fina with pornographic and racist emails that he had exchanged with colleagues in the Attorney General's Office. Brown argued that the emails, which Fina sent and received while supervising the sting operation, demonstrated Fina's bias. The trial court disagreed and barred Brown from introducing the emails on cross-examination.

After the evidentiary phase of trial, the jury was charged, deliberated, and returned a guilty verdict on all charges. The trial court sentenced Brown

to 6 to 23 months' probation. Brown then filed a post-sentence Motion for judgment of acquittal, which the trial court denied. This timely appealed followed.

Brown presents the following issues for our review:

(1) Whether the Commonwealth denied … Brown equal protection under the Fourteenth Amendment to the United States Constitution[,] when it put her on trial before a jury from which members of her race had been purposefully excluded?

(2) Whether the trial court committed reversible error by denying … Brown her right under the Sixth Amendment to the United States Constitution and Article 1, Section 9 of the Pennsylvania Constitution to impeach … Fina's credibility using his racist and sexist emails?

(3) Whether, after finding that the prosecution suffered an actual conflict of interest, the trial court violated … Brown's constitutional rights and committed a clear error of law by refusing dismissal of the case and referral to the Office of the Attorney General?

Appellant's Brief, at 5.

Brown first argues that the trial court erred in denying her **Batson** challenge and allowing the Commonwealth to purposefully exclude members of her race from the jury.

Because a **Batson** claim presents mixed questions of law and fact, our standard of review is whether the trial court's legal conclusions are correct and whether its factual findings are clearly erroneous. **See Commonwealth v. Edwards**, 177 A.3d 963, 970 (Pa. Super. 2018).

Under the **Batson** doctrine, a defendant must first make out a *prima facie* case of discrimination by showing that the Commonwealth struck one or

more prospective jurors on account of race.[3] *See id*., at 971. If a *prima facie* showing is made, then the burden shifts to the Commonwealth to advance a race-neutral explanation for its strikes. *See id*. Finally, the trial court must determine whether the defense has carried its burden of proving purposeful discrimination. *See id*.

Initially, we must determine whether Brown properly preserved her *Batson* claim for appellate review. The Commonwealth argues that Brown failed to create an appropriate record and therefore waived her *Batson* claim on appeal.

Our Supreme Court has stated that a moving party must preserve a full and complete record of the asserted *Batson* violation, as it would otherwise be impossible to conduct meaningful appellate review without the record. *See Commonwealth v. Fletcher*, 861 A.2d 898, 909 (Pa. 2004). This full and complete record requires the moving party to identify the race of venirepersons excluded by the Commonwealth, the race of prospective jurors stricken by the defense, and the racial composition of the final jury. *See id*., at 910. Absent such a record, we cannot address the merits of the moving party's *Batson* claim. *See Commonwealth v. Thompson*, 106 A.3d 742, 752 (Pa. Super. 2014).

---

[3] *Batson* claims have expanded to include claims that jurors were excluded on the basis of their sex. *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994). Brown's challenge, however, is focused on the race of the excluded jurors.

Brown, who is Black, raised a **Batson** claim after the Commonwealth had exercised its peremptory challenges on two Black female jurors. **See** N.T. Jury Trial, 10/22/2018, at 31. A sidebar conference was requested and, at the conference, Brown successfully moved the jury questionnaires into evidence. **See id**. Brown also identified the races of the jurors she struck during jury selection as well as those jurors that the Commonwealth had excluded from the venire. **See id**., at 32.

However, despite her efforts to create a record of her **Batson** claim, Brown fell short of creating a *full and complete record* for our review.

After filing her Notice of Appeal, Brown requested that the trial court transmit the jury questionnaires to this Court as part of the certified record. The trial court failed to transmit the exhibit, and Brown filed an application under Pa.R.A.P. 1926(b)(1) to correct the deficiency.[4] **See** Appellant's Emergency Application. In her Application, Brown sought relief in the form of an order from this Court directing the trial court to transmit the jury questionnaires as a supplemental record. **See id**., at 5. Brown alleged that this Court's intervention was necessary, since the exhibits had been retained by the trial court and she had made multiple attempts to have the questionnaires transmitted to this Court. **See id**., at 2-4. In fact, the trial

_____

[4] Rule 1926(b)(1) provides that "[i]f anything material to a party is omitted from the record by error, breakdown in the process of the court, or accident or is misstated therein, the omission or misstatement may be corrected[.]"

court entered an Order directing that the exhibits be provided to Brown and the Commonwealth. *See id*., at 6. The court reporter responded that all available exhibits had been forwarded to this Court. *See id*., at Exhibit F. A motions panel of this Court denied the Application without prejudice, and ordered Brown to seek relief in the trial court. *See* Order, 02/14/2020.

Brown, perhaps understandably, did not seek further relief in the trial court. The jury questionnaires are therefore not in the record before us. Given the unrebutted allegations in Brown's emergency Application, as well as a review of the transcripts of *voir dire*, we conclude that Brown has done everything within her power to have the exhibits forwarded to this Court. Their absence from the certified record constitutes a breakdown in the court's operation, and we will therefore review the issue based upon the uncontested circumstances surrounding the claim.

Brown's argument is focused on the Commonwealth's strike of venireperson No. 2, a Black female. According to the trial court, the Commonwealth struck two of the three Black venirepersons, as well as the only three other non-white venirepersons. *See* Trial Court Opinion, 10/14/2019, at 9-10. After Brown raised a **Batson** challenge, the trial court found that she had established a *prima facie* case that the Commonwealth had violated **Batson** in striking venirepersons No. 2 and No. 15, the two Black females.

The Commonwealth then presented race-neutral reasons for striking those two women. As noted, Brown's argument on appeal focuses exclusively on No. 2. The Commonwealth stated that it had struck No. 2 for three reasons: 1) "that she was young in age, and, therefore, [believed that she] would be less likely to appreciate the evidence that is going to be presented and be able to follow and understand it[;]" 2) that "[s]he had a scowl on her face during the Commonwealth's *voir dire*, and she looked disinterested in the process, giving us some concern that she would be following the law with the evidence and taking the case seriously[;] and 3) that "she is a behavioral scientist or behavioral specialist, which my concern on that would be she would be overanalyzing the testimony of witnesses and the behavior of every witness who comes in." N.T., Jury Trial, 10/22/2018, at 32-33.

After hearing the Commonwealth's proffered reasons, the court stated that in "reviewing [No. 2] being a behavioral specialist and noting the demeanor as purported by the Commonwealth, we accept that as a reasonable basis to strike." ***Id***., at 33. Brown objected, and argued that the Commonwealth's reasons for striking No. 2 were pretextual. After hearing Brown's argument, the court stated, "I keep to my position." ***See id***., at 36.

On appeal, Brown argues the trial court erred in accepting the Commonwealth's proffered reasons as non-pretextual. The trial court's ultimate resolution of whether the Commonwealth had a discriminatory intent in exercising a peremptory strike is a finding of fact based upon the trial court's

superior ability to assess the credibility of the assertions. **See Commonwealth v. Williams**, 980 A.2d 510, 531 (Pa. 2009). We therefore can only overturn it if the finding is clearly erroneous. **See id**.

As Brown notes, the Commonwealth's first and third reasons are arguably contradictory: either No. 2 was too young to pay attention to the trial, or she, by dint of her education and occupation, was too likely to overanalyze the testimony of the witnesses. Brown further argues that the Commonwealth's second and third reasons are similarly contradictory: if No. 2 appeared "disinterested in the process," **Id**., at 33, then it is hard to understand why the Commonwealth would believe that she was likely to "overanalyz[e] the testimony of witnesses and the behavior of every witness who comes in." **Id**.

The trial court, in its Opinion, opines that under all the circumstances, it found the Commonwealth's proffered reasons to be credible, even though it did not independently observe No. 2's demeanor during *voir dire*. The court further noted that the prosecutor's "demeanor and history in our courtroom have consistently reflected fair-mindedness and a reputation for not engaging in racial violations of this kind." Trial Court Opinion, 10/14/2019, at 15. While Brown certainly raises several reasons to possibly disbelieve the Commonwealth's proffered reasons, we are not making this determination in the first instance. Rather, as noted, we can only reverse the trial court's

determination if it is clearly erroneous. As we do not conclude that Brown's arguments establish that the trial court clearly erred, Brown is due no relief.

Brown highlights the trial court's discussion of the history and reputation of the prosecutor and contends that she did not have the burden to establish a history of unlawful discrimination, merely that juror No. 2 was unlawfully stricken. Brown's argument misses an important qualification. She was certainly not *required* to establish a history of discrimination in making out a *prima facie* case. ***See Flowers v. Mississippi***, 139 S.Ct. 2228, 2241 (2019). But the trial court must consider "all the relevant facts and circumstances," including the history and demeanor of the prosecutor who exercised the challenge. ***See id***., at 2243-44

Here, the court did not require Brown to establish a history of discrimination to make out a *prima facie* case. Nor did it exclusively rely on the prosecutor's history and reputation. Instead, the court considered all the circumstances and concluded that the prosecutor was credible in his assertions. The court did not commit a clear error, and we therefore affirm its ruling on this issue.

Next, Brown argues that the trial court deprived her of the right to impeach Fina's credibility with racist and pornographic emails, to establish Fina's bias against her. In barring her from doing so, Brown asserts the trial court committed errors of law and ultimately abused its discretion.

The admission of evidence is within the sound discretion of the trial court and will be reversed only upon an abuse of that discretion. **See Commonwealth v. Woodard**, 129 A.3d 480, 494 (Pa. 2015). An abuse of discretion is not merely an error of judgment, but a misapplication of the law or an unreasonable exercise of judgment. **See Commonwealth v. Sitler**, 144 A.3d 156, 163 (Pa. Super. 2016) (*en banc*).

The threshold inquiry for the admission of evidence is whether the evidence is relevant. **See Commonwealth v. Cook**, 952 A.2d 594, 612 (Pa. 2008). Evidence is relevant if it has any tendency to make a fact of consequence more or less probable than it would be without the evidence. **See** Pa.R.E. 401. However, even if evidence is relevant, it may be excluded if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. **See** Pa.R.E. 403; **see also Commonwealth v. Williams**, 91 A.3d 240, 242 (Pa. Super. 2014).

The trial court concluded that Fina's racist and pornographic emails were irrelevant and, therefore, inadmissible. **See** Trial Court Opinion, 10/14/19, at 16-17. In its Opinion, the court found that "[a]ny arguable relevance would clearly be outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, and waste of time." **Id**. The court also

explained that sending or receiving inappropriate, sexually and racially offensive emails had no bearing on credibility. *See id*., at 17.

In contrast, Brown argues that Fina's pornographic and racist emails tended to show bias and were relevant to impeach Fina's credibility on cross-examination. To support her argument, Brown relies on a series of cases recognizing that evidence of bias is almost always relevant to impeach a witness's credibility. *See* Appellant's Brief, at 61-63 (citing *Commonwealth v. Abu-Jamal*, 555 A.2d 846, 852-53 (Pa. 1989), *Commonwealth v. Rouse*, 782 A.2d 1041, 1045 (Pa. Super. 2001), and *Commonwealth v. Butler*, 601 A.2d 268, 271 (Pa. 1991)). Therefore, under the weight of Pennsylvania authority, Brown asserts that the trial court should have allowed her to introduce evidence of Fina's bias on cross-examination.

"[A] witness may be cross-examined on any matter tending to show the interest or bias of that witness." *Commonwealth v. Nolen*, 634 A.2d 192, 195 (Pa. 1993); *see also* Binder on Pennsylvania Evidence § 6.07 at 316. However, a trial court has discretion to impose reasonable limits on defense counsel's inquiry into the potential bias of a prosecution witness. *See Commonwealth v. Rosser*, 135 A.3d 1077, 1088 (Pa. Super. 2016) (*en banc*). "Generally speaking, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id*. (citation omitted). The trial court's exercise of its discretion will only be

reversed if the court clearly abused its discretion or committed an error of law. *See id*., at 1087.

In exercising its discretion, the trial court may limit the scope of defense counsel's cross-examination based on concerns that the matter is collateral, would likely confuse or mislead the jury, or would waste time. *See Commonwealth v. Largaespada*, 184 A.3d 1002, 1009 (Pa. Super. 2018). "[A] collateral matter is one which has no relationship to the case at trial." *Commonwealth v. Guilford*, 861 A.2d 365, 369 (Pa. Super. 2004).

Here, the trial court's decision to limit the scope of cross-examination, and prohibit Brown from using the pornographic and racist emails to explore Fina's potential bias, was not an abuse of discretion. The emails may have been probative of Fina's bias and therefore his credibility. However, Fina's direct testimony was not directly relevant to the question of Brown's guilt or innocence. Instead, the Commonwealth presented Fina to rehabilitate Ali's credibility, after Brown had attacked it on cross-examination. To that end, Fina testified at length regarding Ali's cooperation with the Attorney General's Office as a confidential witness and the factors that were considered when a plea bargain was offered to Ali. *See* N.T., Jury Trial, 10/26/2018, at 68-81.

Brown correctly notes that "a criminal defendant has a right to cross[-] examine any adverse witness," and that an adverse witness "may be impeached by evidence which tends to show … that the witness may possess a bias which colors his testimony[.]" *Butler*, 601 A.2d at 268. But Brown

was not prevented from cross-examining Fina. Nor was she prohibited from asking him about any bias he might harbor. She was merely prohibited from introducing the emails as a means of establishing Fina's bias. And the emails were clearly a collateral matter, as they were not directly relevant to any issue in dispute at Brown's trial.

Because the emails themselves did not tend to prove or disprove Brown's guilt, nor affect the credibility of a witness that testified to facts directly related to the issue of Brown's guilt, they were excludable as collateral evidence. *See Guilford*, 861 A.2d at 369-370 (holding that evidence of witness's intoxication at preliminary hearing was excludable on cross-examination because it could not establish the witness had a motive to fabricate his trial testimony). Further, while we cannot agree with the trial court's conclusion that the e-mails are incapable of establishing bias, we find no error in the court's conclusion that questioning Fina on the emails raised the specter of confusing the issues before the jury and opening a rabbit hole of wasteful back and forth over the content of the emails and how much Fina actively participated in creating and circulating the emails. Therefore, the trial court did not abuse its discretion in limiting the scope of cross-examination.[5]

---

[5] While the basis for our decision is slightly different than the basis explicitly set forth by the trial court, we note that we may affirm on any basis supported by the record. *See Commonwealth v. Singletary*, 803 A.2d 769, 772 (Pa. Super. 2002).

- 16 -

In her final issue, Brown argues that the trial court erred in denying her Motion to disqualify the Dauphin County District Attorney's Office from prosecuting the case.

We review a trial court's decisions on conflict of interest and disqualification for an abuse of discretion. *See Commonwealth v. Sims*, 799 A.2d 853, 856 (Pa. Super. 2002). "[A] prosecution is barred when an actual conflict of interest affecting the prosecutor exists in the case[.]" *Commonwealth v. Eskridge*, 604 A.2d 700, 702 (Pa. 1992). However, mere allegations of a conflict of interest are insufficient to warrant replacement of a district attorney. *See Commonwealth v. Mulholland*, 702 A.2d 1027, 1037 (Pa. 1997).

As noted above, the trial court disqualified the special prosecutors because then-Acting Philadelphia District Attorney Martin had conflicts of interest in the case. From that point on, the Dauphin County District Attorney's Office prosecuted the case against Brown, including the present appeal, without the assistance of the Philadelphia District Attorney's Office. Nonetheless, Brown maintains that District Attorney Marsico became hobbled with an actual conflict of interest simply by participating with the Philadelphia District Attorney's Office in the case. On that basis, Brown argues that the trial court should have disqualified the Dauphin County District Attorney's Office and referred the matter to the Attorney General's Office.

This Court, sitting *en banc*, addressed a similar conflict of interest issue in **Commonwealth v. Miller**, 422 A.2d 525 (Pa. Super. 1980) (*en banc*). In **Miller**, the appellant sought the disqualification of the entire district attorney's office, because the district attorney previously had served as the county's chief public defender and had represented the appellant's co-defendant in that capacity. The Commonwealth, on the other hand, asserted that disqualification of the entire district attorney's office was unnecessary because the district attorney had recused himself from all matters involving the public defender's office. Even so, the appellant maintained that the continued prosecution of the case by the district attorney's staff created the appearance of impropriety. **See id**., at 526-527.

The **Miller** Court rejected the appellant's "appearance of impropriety" argument and held that individual disqualification, as opposed to disqualification of an entire district attorney's office, is sufficient when an actual conflict of interest exists. **See id**., at 529. As such, the **Miller** Court concluded that it was unnecessary to disqualify the entire district attorney's office, because the district attorney had abided by his self-imposed recusal. **See id**.

Like the **Miller** Court, we find that disqualification of the special prosecutors, as opposed to disqualification of the entire Dauphin County District Attorney's Office, was appropriate in this matter. **See Miller**, 422 A.2d at 529. The mere fact that the special prosecutors participated in some

aspects of the case does not compel disqualification of the entire district attorney's office. Furthermore, Brown presents no argument or legal authority explaining how District Attorney Marsico retained a conflict of interest after the trial court disqualified the special prosecutors. Therefore, the trial court did not abuse its discretion when it refused to disqualify the entire Dauphin County District Attorney's Office from the case.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/30/2020