J-S17010-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JARED DONOVAN JONES | |
| Appellant | No. 92 MDA 2021 |

Appeal from the PCRA Order Entered December 30, 2020
In the Court of Common Pleas of Lebanon County
Criminal Division at No: CP-38-CR-0000424-2016

BEFORE: STABILE, J., KUNSELMAN, J. and PELLEGRINI, J.*

MEMORANDUM BY STABILE, J.:                    **FILED JULY 13, 2021**

Appellant, Jared Donovan Jones, appeals from an order denying his petition under the Post Conviction Relief Act ("PRCA"), 42 Pa.C.S.A. §§ 9541-9546. Appellant argues that his former counsel was ineffective for (1) erroneously advising him not to testify during his trial for first-degree murder and multiple other offenses, (2) failing to call Larry Bordner, a taxicab driver who transported Appellant out of Lebanon County on the night of the murder, as a witness during trial, (3) failing to pursue issues on direct appeal, and (4) failing to request a jury instruction that a recording of a telephone conversation between co-defendant Richard Kennard and a third

_____

* Retired Senior Judge assigned to the Superior Court.

person was not admissible against Appellant. We conclude that none of these arguments warrant relief, and we affirm.

The PCRA court aptly summarized the evidence against Appellant as follows:

> This case arises from events that occurred on September 19, 2015 at Vinny's Good Time Night Club (hereafter, "VINNY'S") in the city of Lebanon. About ten minutes before the club was scheduled to close, a dispute erupted between Richard KINNARD, II (hereafter "KINNARD"), [APPELLANT] and a security officer employed by VINNY'S. Both KINNARD and [APPELLANT] were ejected from the club. After a short hiatus, KINNARD returned to the nightclub. Shots were fired. Corey Bryan (hereafter "BRYAN") was struck and killed. Despite the fact that VINNY'S was crowded when the shooting occurred, most patrons left the premises at or before the arrival of police. No one professed to have seen the shooting. An investigation ensued. Eventually, that investigation was chronicled in a jury trial that took place during February of 2017.
>
> The centerpiece of the Commonwealth's case in chief was footage from a videotape surveillance system at VINNY'S. The videotape showed KINNARD and [APPELLANT] engaged in an argument with security officer BRYAN. The tape also depicted KINNARD and [APPELLANT] leaving VINNY'S and entering the parking lot. Shortly thereafter, the video depicted KINNARD returning to the bar entrance. Another camera showed BRYAN at the door toward which KINNARD had been walking. The video depicted BRYAN clutching his stomach and falling to the ground. Thereafter, most patrons scurried away. KINNARD was caught on video running to a car. None of the camera views depicted the shooting or anyone in possession of a firearm.
>
> VINNY'S surveillance system showed KINNARD enter a car in the parking lot. The car then departed the parking area and turned north on Route 343. Shortly thereafter, North Lebanon Township Police were called to the scene of a one vehicle accident north of the City of Lebanon. Sergeant Timothy Knight of the North Lebanon Township Police Department arrived at the scene of the crash, which was approximately two miles from

VINNY'S. When he arrived, no one was present in the vehicle. Upon additional investigation, Sergeant Knight learned that the vehicle was registered to William KINNARD. Blood was located throughout the vehicle. Wedged in behind the right rear headrest was a gun. Sergeant Knight checked the serial number of the firearm and learned that it had been stolen. When the vehicle was subsequently processed more completely, police also found a payment receipt for a loan registered to KINNARD, a medical paper pertaining to KINNARD, a letter from the Harrisburg Area Community College addressed to [APPELLANT], an LA Fitness paper in the name of KINNARD, a MoneyGram with KINNARD's name on it, health documents from Memorial Hospital pertaining to KINNARD, and insurance paperwork in the name of Patty KINNARD.

The gun found inside the BMW vehicle was sent for ballistics testing. In addition, bullets were found inside VINNY'S and a projectile was recovered from the body of BRYAN. Trooper Todd Neumyer, a firearms expert with the Pennsylvania State Police, testified that the bullets recovered from the body of BRYAN and at VINNY'S were fired from the gun that had been located in the BMW vehicle that crashed.

The parties reached a stipulation that the blood recovered from the BMW vehicle was transmitted to the Pennsylvania State Police Crimes Laboratory for serology and DNA testing. There, a forensic DNA scientist by the name of Sabine Panzner-Kaelin completed testing that revealed the existence of blood from KINNARD and [APPELLANT] inside the crashed BMW vehicle.

Following the crash of their BMW vehicle, both [APPELLANT] and KINNARD left the area. Detective Keith Uhrich chronicled the efforts made by police to locate both men. With respect to KINNARD, police learned that he purchased a bus ticket to travel from York, Pennsylvania, to Tucson Arizona. The United States Marshalls were contacted for assistance. Eventually, the Marshalls located KINNARD in Tucson on January 26, 2016. With respect to [APPELLANT], Detective Uhrich communicated with his sister and his mother. On January 27, 2016, [APPELLANT] was apprehended in Hershey, Pennsylvania.

Following his apprehension, [APPELLANT] provided a recorded statement to police. This statement became the focus of extensive pre-trial litigation that will be chronicled within the

body of this Opinion. Eventually, the Court crafted a statement that could be read to the jury. This statement incorporated some of [APPELLANT]'s own words and some paraphrasing. The statement of [APPELLANT] read to the jury focused upon the conduct of [APPELLANT] and not the conduct of KINNARD. Specifically, [APPELLANT] admitted that he was at VINNY'S on the night of the murder. He admitted that he had an argument with BRYAN. He admitted that he drove the BMW vehicle belonging to William KINNARD away from VINNY'S. He acknowledged that he crashed the vehicle. After regaining consciousness following the crash, [APPELLANT] acknowledged that he left the scene of the accident and that he left Lebanon County. In the statement, [APPELLANT] denied having any knowledge or connection to the shooting death of BRYAN.

After KINNARD and [APPELLANT] were apprehended by police, they were confined at the Lebanon County Correctional Facility. The Correctional Facility possesses a system by which telephone calls involving inmates can be monitored and recorded. Every inmate is advised in advance that his/her telephone calls are subject to interception and recording. Several telephone calls of note involving KINNARD were intercepted and recorded. Specifically, the phone calls included the following:

• On March 27, 2016, KINNARD told an unidentified female that "I got some time to do" and the time would be measured in "years". (N.T. 433)

• On March 29, 2016, KINNARD told an unknown individual "I am looking at some time" and he references that he will be in prison at least ten years. He indicated that he wanted to "prepare" his family for that reality.

• On May 7, 2016, KINNARD complained to an unknown female about how the Lebanon [County] District Attorney wanted to lock him up for life. In that conversation, he indicated that he would take a "reasonable" plea bargain deal.

These telephone calls were the focus of a pre-trial proceeding. On February 6, 2017, this Court issued a nine-page Opinion. We overruled KINNARD's objections based upon relevance and the plea bargain privilege. A final decision regarding the phone calls was deferred until trial. At trial, we permitted the jury to hear the phone calls and we afforded wide latitude for the defense to

explain why the statement made by KINNARD during the telephone calls should not reflect his consciousness of guilt.

PCRA Court Opinion, 12/30/20, at 2-7.

Appellant and Kinnard were tried together in a jury trial. The jury found Appellant guilty of first-degree murder, third-degree murder, two counts of aggravated assault, flight to avoid apprehension, and five counts of conspiracy.[1] On March 22, 2017, the trial court sentenced Appellant to life imprisonment without possibility of parole for first-degree murder and imposed additional terms of imprisonment on other counts. Appellant filed a timely direct appeal, and on September 24, 2018, this Court affirmed his judgment of sentence. On March 12, 2019, our Supreme Court denied Appellant's petition for allowance of appeal. Appellant did not appeal to the United States Supreme Court.

On March 27, 2020, Appellant filed a timely PCRA petition.[2] On December 30, 2020, following an evidentiary hearing, the PCRA court issued an opinion and order denying Appellant's petition. This timely appeal

_____

[1] 18 Pa.C.S.A. §§ 2502(a) and (c), 2702, 5126, and 903, respectively.

[2] The one-year limitation period for filing PCRA petitions runs from "conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review." 42 Pa.C.S.A. § 9545(b)(3). In this case, the time for seeking review in the United States Supreme Court expired ninety days after our Supreme Court denied Appellant's petition for allowance of appeal, or on June 10, 2019. U.S. Sup.Ct. Rule 13(1). Thus, the deadline for Appellant's PCRA petition fell on June 10, 2020. Appellant filed his PCRA petition more than two months before the deadline.

followed. The PCRA court did not order Appellant to file a Pa.R.A.P. 1925 statement or file a Pa.R.A.P. 1925 opinion. Nevertheless, the court's December 30, 2020 opinion is more than adequate for purposes of appellate review.

Appellant raises the following issues on appeal:

I. Can Appellant's decision not to testify based solely on trial counsel's erroneous advice be deemed knowing or intelligent?

II. Is trial counsel's failure to call Larry Bordner as a trial witness ineffective assistance of counsel?

III. Is trial counsel's failure to preserve and fully pursue issues on appeal ineffective assistance of counsel?

IV. Does trial counsel's failure to request that the [t]rial [c]ourt [j]udge instruct the jury that the prison audio recordings of [co-defendant] Richard Kinnard and a third party were only admissible against Richard Kinnard and should not be considered as evidence against Appellant warrant a new trial due to trial counsel's ineffectiveness?

Appellant's Brief at 3.

To prevail on a claim of ineffective assistance, the petitioner must plead and prove that the underling claim is of arguable merit; that counsel had no reasonable strategic basis for the disputed action or inaction; and that there is a reasonable probability that the outcome of the proceeding would have been different but for counsel's error. *Commonwealth v. Spotz*, 84 A.2d 294, 311-12 (Pa. 2014). Failure to satisfy any one of these prongs is fatal to a claim of ineffective assistance. *Commonwealth v. Chmiel*, 30 A.3d 1111, 1128 (Pa. 2011). The PCRA court's factual findings

are binding if the record supports them, and we review the court's legal conclusions *de novo*. *Commonwealth v. Mason*, 130 A.3d 601, 617 (Pa. 2015).

Appellant first argues that trial counsel was ineffective for advising him not to testify during trial. We disagree.

"The decision of whether or not to testify on one's own behalf is ultimately to be made by the defendant after full consultation with counsel." *Commonwealth v. Sandusky*, 203 A.3d 1033, 1075 (Pa. Super. 2019). To prove that counsel was ineffective for failing to advise the defendant of his rights in this regard, the PCRA petition "must demonstrate either that counsel interfered with his right to testify, or that counsel gave specific advice so unreasonable as to vitiate a knowing and intelligent decision to testify on his own behalf." *Id.* "[W]here a defendant voluntarily waives his right to testify after a colloquy, he generally cannot argue that trial counsel was ineffective in failing to call him to the stand." *Id.*

Here, during trial, the court held the following colloquy with Appellant:

THE COURT: Mr. Jones, you have a right to testify. Do you understand that?

APPELANT: Yes.

THE COURT: If you testify you will be able to tell the jury your version of events. Do you understand that?

APPELLANT: Yes.

THE COURT: If you testify, however, you will be subject to cross-examination by the Commonwealth. You will have to answer the Commonwealth's questions. Do you understand that?

APPELLANT: Yes.

THE COURT: You also have a right not to testify. Do you understand that?

APPELLANT: Yes.

THE COURT: If you choose not to testify, I will tell the jury that they cannot infer anything at all because of your decision. Do you understand that?

APPELLANT: Yes.

'THE COURT: Have you discussed the decision of whether or not to testify with your lawyer?

APPELLANT: Yes.

THE COURT: Have you made a decision with respect to whether or not you wish to testify?

APPELLANT: Yes, sir.

THE COURT: What is that decision?

APPELLANT: No.

THE COURT: No, meaning what?

APPELLANT: Not to testify.

THE COURT: Your choice is you do not want to testify; is that correct?

APPELLANT: Yes, sir.

THE COURT: That is a decision you voluntarily made yourself?

APPELLANT: Yes.

THE COURT: Has anyone forced you to make that decision?

JONES: No.

N.T., Volume III, at 523-525. Thus, following discussion with trial counsel and a full and complete colloquy with the court, Appellant knowingly, voluntarily and intelligently elected not to testify during trial. Accordingly, Appellant cannot complain now that trial counsel was ineffective for not calling him to the stand.

Furthermore, counsel's decision not to call Appellant was reasonable because Appellant had a conviction for *crimen falsi* (robbery) within ten years before trial. **Commonwealth v. Whitney**, 708 A.2d 471, 476 (Pa. 1998) ("[c]ounsel is not ineffective where [his] decision to not call defendant was reasonable, *e.g.*, where defendant could be impeached with his prior record of offenses *crimen falsi*"). The evidence presented during the PCRA evidentiary hearing demonstrated that Appellant had a conviction for robbery within ten years before trial in this case. N.T., 11/12/20, at 18, 35. Robbery is *crimen falsi*, and a conviction for this offense is admissible for impeachment purposes. **Commonwealth v. Harris**, 884 A.2d 920, 925 (Pa. Super. 2005). Counsel's decision to advise Appellant against testifying to prevent the jury from learning about this conviction was reasonable.

Next, Appellant argues that counsel was ineffective for failing to call Larry Bordner as a witness. Records provided during pretrial discovery identified Bordner as a cab driver who picked up Appellant in the Lebanon

area approximately four hours after the shooting and drove him to York, Pennsylvania. N.T., 11/12/20, at 42. According to Appellant, Bordner would have testified that Appellant was alone and intoxicated at the time Bordner picked Appellant up, thus demonstrating that Appellant lacked intent to murder Bryan. This argument fails for two reasons.

First, the defense of intoxication was not available to Appellant during trial. Voluntary intoxication is only available if (1) it is "relevant to reduce murder from a higher degree to a lower degree of murder," 18 Pa.C.S.A. § 308, and (2) the defendant admits responsibility for the underlying action but contests the degree of culpability "based upon his inability to formulate the requisite mental state." *Commonwealth v. Williams*, 980 A.2d 510, 527 (Pa. 2009). Here, Appellant did not admit responsibility for Bryan's murder; he claimed he was innocent of any offense, and he blamed the entire event on Kinnard. As a result, evidence of Appellant's intoxication would have been inadmissible during trial,[3] so Bordner's testimony on Appellant's degree of intoxication would have been inadmissible as well.

Second, even if Bordner's testimony was admissible, Appellant was required to demonstrate, *inter alia*, that Bordner was available to testify for the defense, that he was willing to testify, and that the absence of his

---

[3] For this reason, we held during Appellant's direct appeal that the trial court properly refused to allow Appellant to offer a voluntary intoxication defense. *Commonwealth v. Jones*, 2018 WL 4560395, *3-4 (Pa. Super. 2018).

testimony was so prejudicial as to have denied the defendant a fair trial. **_Commonwealth v. Medina_**, 209 A.3d 992, 998 (Pa. Super. 2019). Appellant failed to present any evidence during PCRA proceedings that Bordner was available or willing to testify as a defense witness during trial. Furthermore, Bordner's testimony about Appellant's condition four hours after the shooting, or the fact that he was alone, was at most marginally relevant as to Appellant's state of mind at the time of the shooting. The lack of this testimony did not prejudice Appellant.

Next, Appellant argues that during his direct appeal, trial counsel (who continued to represent Appellant on direct appeal) was ineffective for failing to present legal argument "regarding Pennsylvania law on severance motions, the admissibility of evidence, jury instructions, or the standards governing our review of those issues." Appellant's Brief at 14. Appellant's brief fails to identify, however, the severance, admissibility and jury instruction issues that Appellant should have raised, or how the absence of these issues prejudiced him. **_Id._** Accordingly, this argument does not entitle Appellant to relief.

Lastly, Appellant argues that trial counsel was ineffective for failing to request a limiting instruction concerning a telephone call played at trial between Kinnard and a third person. The PCRA court properly determined that no relief is due.

The Lebanon County Prison intercepted and recorded a call between Kinnard and his friend. Appellant did not participate in the call. During the conversation, there were references to "Little Wolf or Little Dog messed up." N.T. 11/12/20 at pg. 19. There was also a remark that "little Wolf dropped the ball." *Id.* at 45. Appellant's name was never mentioned in this recording. *Id.* at 22. Nor was there evidence during trial that Appellant was ever referred to as "Little Wolf". *Id.* at 23.

Trial counsel objected during trial to admission of the phone call. The court ruled that it was admissible but instructed the Commonwealth not to refer to the phone call in any argument against Appellant. Trial counsel, however, did not ask the court to instruct the jury that it could not consider the call as evidence against Appellant, a so-called ***Bruton***[4] instruction.

During the PCRA hearing, trial counsel took the position during his testimony that his failure to request a limiting instruction prejudiced Appellant:

> I believe that prison recording is what demonstrated to the jury that there was a conspiracy between [Appellant] and Kinnard. When Kinnard referenced Little Wolf—obviously he didn't say [Appellant]—but sitting right behind me through the entire six days of the trial was Richard Kinnard, who is a very big guy, and

---

[4] In ***Bruton v. United States***, 391 U.S. 123 (1968), the United States Supreme Court held that a defendant is deprived of his rights under the Confrontation Clause of the Sixth Amendment when his non-testifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant.

[Appellant], who was half his size sitting right beside him. They were discussing Kinnard getting out of town. To me, it was clear who Little Wolf was. It was the guy that was half the size of Kinnard. When he said, "Little Wolf dropped the ball," I believe that was in reference to [Appellant] wrecking the car as they left the bar that night. That had been testified to at trial. So, I believe—and, also, that exhibit was the only piece of information that the jury requested to hear again after they began deliberating. Kinnard had been convicted long before that tape was played. I mean, the surveillance video showed him outside the door immediately prior to the shooting. It showed him running away from the door after the shooting. The murder weapon was found in Kinnard's car. So, I don't believe that that tape helped convict Kinnard, but I believe it helped convict [Appellant].

N.T., 11/12/20, at 45-46.

The PCRA court rejected Appellant's argument, reasoning that Appellant failed to prove during the PCRA hearing that "little wolf" was a reference to him:

It was not until [Appellant]'s PCRA that his argument about "Little Wolf" was raised. Never once at trial or in Post-Sentence Motions did anyone refer to [Appellant] as "Little Wolf" or provide evidence that [Appellant] ever went by the nickname "Little Wolf." It was not until the PCRA hearing that any effort was made to equate [Appellant] with the moniker "Little Wolf."

Nothing about the conversation between KINNARD and his friend implicated [Appellant]. [Appellant]'s name was not mentioned. No effort was made by anyone to tie the vague references to "Little Wolf" to [Appellant]. Moreover, this Court specifically prohibited the Commonwealth from even mentioning the KINNARD telephone call in its arguments regarding [Appellant].

Had we been faced with a situation where KINNARD was reported to have said "[Appellant] was the killer," we would not have even permitted the jury to hear such a statement because of **Bruton**. Given trial counsel's obvious familiarity with the **Bruton** rule, and given the amount of time spent by all counsel and the Court dealing with various **Bruton** issues at and before

- 13 -

> trial, it is crystal clear to this Court that had KINNARD's intercepted telephone call been truly inculpatory of [Appellant], that would have been addressed. The fact that no one—even the prosecutor—attempted to use KINNARD's telephone call against [Appellant] speaks volumes about the innocuous nature of any oblique references to other people that were included in KINNARD's conversation.

PCRA Court Opinion, 12/30/20, at 26-27.

As stated above, the PCRA court's factual findings are binding if the record supports them. The PCRA court herein made a factual determination that nothing in Kinnard's telephone conversation tied the name "Little Wolf" to Appellant. The record supports this finding. Appellant's claim that he had to be "Little Wolf" because Kinnard was much larger than him is self-serving conjecture. "Little Wolf" could just as easily have been Kinnard's nickname for himself as he spoke with a trusted associate on the telephone. The Commonwealth presented considerable evidence during a weeklong trial concerning Appellant's behavior on the night of the homicide, his anger at being thrown out of the bar, the shooting shortly thereafter, and Appellant's central role in fleeing the scene. His conviction rests upon this evidence, not a telephone call in which Appellant did not participate and was never mentioned. Appellant failed to demonstrate that this issue has arguable merit or that there was a reasonable probability that his trial outcome would have been different.

For these reasons, we affirm the order denying Appellant's PCRA petition.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:07/13/2021